# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
No.: 1:05-cv-1209C
JUDGE LAWRENCE M. BASKIR

| | |
|---|---|
| **JENNINGS TRANSMISSION SERVICE OF GOLDSBORO, INC.,** ) | |
| **Plaintiff,** ) | |
| **v.** ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| **Defendant,** ) | **JENNINGS' OPENING BRIEF ON CLAIM CONSTRUCTION** |
| **and** ) | |
| **JASPER ENGINES & TRANSMISSIONS** ) | |
| **Third-Party Defendant,** ) | |
| **and** ) | |
| **READY BUILT DISTRIBUTORS, INC.,** ) | |
| **Third-Party Defendant.** ) | |

## Table of Contents

**I. Statement of the Case** ........ 1

**II. Statement of the Facts** ........ 2

**III. Argument** ........ 4

A. The Legal Standard for Construing Patent Claim Terms ........ 4

B. Construction of Claim Terms in the '609 Patent ........ 7

1. "Change-over linkage" appearing in claims 1, 4, 5, 7, and 12; and "right-to-left change-over linkage" appearing in claim 11 ........ 7

2. "Gear selection mechanism" appearing in claims 1, 5, 7, 11 and 12 ........ 14

3. "Shift lever of the replacement transmission" appearing in claims 1, 5, 7, 11 and 12 ........ 17

4. "Said elongated member having first and second ends that are rotatively supported" appearing in claim 1; and "An elongated member supported for rotational movement at its right and left ends" apearing in cliams 5 and 7 ........ 18

5. "Means proximate the first end of said elongate member connecting the gear selection mechanism of the vehicle to said elongate member for imparting rotational movement to the member in response to the driver's selection of gear" appearing in claim 1 ........ 21

6. "Means proximate the right end of said elongated member for connecting the gear selection mechanism of the vehicle to the elongated member for imparting rotational movement to the elongated member in response to the driver's selection of gear" appearing in claims 5 and 7 ........ 28

7. "Means proximate the second end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongate member to movement operating the shift lever of the replacement transmission" appearing in claim 1 ..................... 25

8. "At least one additional length pivotally connected to the first component" appearing in claims 5 and 7 .................... 27

9. "Kit" appearing in claim 7 ..................................................... 29

10. "Connecting" appearing in claims 1, 5, 7, 11 and 12 ............... 33

11. The Government's contention that method claim 11 should be construed to require a sequence or order limitation ....................................................................... 35

# Table of Authorities

## Statutes

28 U.S.C. § 1498(a) (1998) ........ 1 & 8

35 U.S.C. §112 (1975) ........ 38

## Rules

FED. CL. R. 14(b) ........ 1

## Cases

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) ........ 37, 38, & 39

*Asyst Techs. Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001) ........ 23, 24, 25, & 26

*Brown v. 3M*, 265 F.3d 1349 (Fed. Cir. 2001) ........ 10

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371(Fed. Cir. 2005) ........ 12

*Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998). ........ 5, 6, & 7

*Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ........ 37

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 249 F.3d 1314 (Fed. Cir. 2001) ........ 22

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ........ 18

*Micro Chemical Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250 (Fed. Cir. 1999) ........................................................ 26

*O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576 (Fed. Cir. 1997)................. 31

*Phillips v. AWH Corp.*, 415 F. 3d 1303 (Fed.Cir. 2005) *cert. denied* 126 S.Ct. 1332 (2006)................................................ 5, 6, 7, 10, 12, 13, 15, 20, 35, 36, & 38

*Scripps Clinic & Resp. Found. v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991) ................................................................ 6

*Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823 (Fed. Cir. 2003) ................................................................ 31

*Telemac Cellular Corp. v. Topp Telecom Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) ................................................................ 22

*Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ................................................................ 20

*Transmatic, Inc. v. Gulton Ind.*, 53 F.3d 1270 (Fed. Cir. 1995) *appeal after remand*, 180 F.3d 1343 (Fed. Cir. 1999)............................ 5

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (1996)................................................................ 5, 6

**Pleadings**

D. 28, *Special Procedures Order for Cases Under 28 U.S.C. § 1498(a)* ................................................................ 8

**Appendix**

US 6,085,609.............................................. 11, 16, 17, 19, 28, 33, 35, & 36

'609 Prosecution History ................................................ 12, 13, & 16

Joint Claim Construction Statement and Joint Status Report.................................................... 18, 22, 26, 27, 28

"end" from dictionary.com ........................................................... 20 & 21

"connection" from *The American Heritage Dictionary of the English Language* .......................................................................26

"kit" from Yahoo! Education .......................................................................34

On January 19, 2007 the parties filed a Joint Claim Construction Statement ("JCCS") and Joint Status Report. Pursuant to the Court's Order of February 12, 2007, Jennings Transmission Service of Goldsboro, Inc. ("Jennings") submits its opening brief and supporting evidence with respect to the claim construction issues set forth in the JCCS.

## I. Statement of the Case

This is patent infringement action instituted pursuant to 28 U.S.C. § 1498(a). Jennings owns U.S. Patent No. 6,085,609 ("the '609 patent") (App. 1) and seeks to recover from the United States ("the Government") reasonable compensation for the infringement of the '609 patent by the United States Postal Service ("USPS"). The Government pursuant to FED. CL. R. 14(b), noticed two third parties, Jasper Engines & Transmissions ("Jasper") and Ready Built Distributors, Inc. ("Ready Built"), and invited them to appear to assert whatever interest they may have in this action. Both Jasper and Ready Built elected to appear. In accordance with the JCCS the parties identified a series of claim terms from the '609 patent that are in dispute and require construction. Jennings submits its opening brief which discusses each of the claim terms and how they should be construed.

## II. Statement of the Facts

Jennings, a small, family-owned business located in Goldsboro, North Carolina, repairs, rebuilds, and replaces transmissions for customers, to include transmission repair shops in the southeast United States. During the 1980s and early 1990s the USPS purchased a fleet of Grumman LLV postal vehicles. It is believed that the USPS purchased tens of thousands of these vehicles. The Grumman LLV postal vehicle is a right hand drive vehicle, meaning that the driver's seat is on the right side of the vehicle.

The Grumman LLV postal vehicle came equipped with a TH180C transmission. The USPS experienced numerous and repeated transmission failures with the Grumman LLV postal vehicle. In some cases the TH180C transmission failed after only nine to twenty months of service. Failure of the TH180C transmission was extensive and occurred throughout the entire fleet of Grumman LLV postal vehicles.

Initially the USPS resorted to contracting with outside transmission repair shops to repair the failed TH180C transmissions. Jennings was one of the outside transmission repair services used by the USPS, and over a period of time Jennings repaired many failed TH180C transmissions. The repaired TH180C transmissions perform no better than the original TH180C

transmissions. The USPS continues to experience an unusually high failure rate for both original and repaired TH180C transmissions.

Jennings, knowing of the severe problems that the USPS was experiencing with the TH180C transmission, set out to solve the problem. Jennings concluded that the TH180C transmission, which is a transmission specifically designed for a right hand vehicle, should be replaced with a more reliable and rugged transmission, one more suited to the demanding stop and go driving conditions that postal vehicles experience on a daily basis. Jennings surveyed commercially available transmissions, but found no suitable replacement transmission designed for a right hand vehicle, and that would easily fit into the Grumman LLV postal vehicle. Since the Grumman LLV postal vehicle is a right hand drive, it requires a right hand transmission, that is, a transmission having a shift lever disposed on the right side of the transmission housing. With no suitable and practical right hand transmissions commercially available, Jennings decided to retrofit the right hand drive Grumman LLV vehicle with a left hand transmission, suitable for the demanding conditions faced by postal vehicles. To make the left hand transmission work in a right hand vehicle, Jennings designed a change-over linkage for connecting the left hand replacement transmission with the existing gear selection mechanism of the Grumman

LLV postal vehicle. Jennings applied for and was granted the '609 patent which covers a transmission replacement kit for a right hand vehicle.

Initially, Jennings manufactured replacement transmission kits and sold them to the USPS. Subsequently, the USPS started purchasing the same and similar transmission replacement kits from competitors of Jennings. The USPS continues to purchase replacement transmission kits from competitors.

## III. Argument

### A. The Legal Standard for Construing Patent Claim Terms

Infringement of a patent claim is determined through a two step process. First, the claim is construed to determine its scope. Second, the properly construed claim is compared to the accused device or process. The issue before the Court is how certain disputed claim terms of the '609 patent should be construed.

In construing patent claims, there are two types of evidence, intrinsic and extrinsic. Intrinsic evidence is the patent documents, particular to the patent and its prosecution history. Extrinsic evidence is evidence external to the patent documents. Extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of claim

language. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) *cert. denied* 126 S. Ct. 1332 (2006). In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (1996). In such circumstances, it is improper to rely on extrinsic evidence. *Id.* at 1583; *accord Phillips*, 415 F.3d at 1312. The Federal Circuit expresses great reservation about using extrinsic evidence, even dictionaries, in claim construction. *Phillips,* 415 F.3d at 1317-23.

The claims are the most important part of the intrinsic record. "It is a 'bedrock principle' of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 312. Accordingly, the starting point in a claim construction analysis is always with the language of the claims. *Comark Communications Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998). It is the claims of a patent that measure and define the invention. Thus, in construing a claim, courts can neither broaden nor narrow the claim terms. *Transmatic, Inc. v. Gulton Ind.*, 53 F.3d 1270, 1277-78 (Fed. Cir. 1995) *appeal after remand*, 180 F.3d 1343 (Fed. Cir. 1999). The construction of claims is simply elaborating the normally terse language of the claims in order to understand and explain,

but not to change, the scope of the claims. *Scripps Clinic & Resp. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991).

The words of a claim are generally given their ordinary and customary meaning. *Vitronics*, 90 F.3d at 1582; *Phillips*, 415 F.3d at 1312. The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art, viewing the claim term in the context of the entire patent document including the written description and the prosecution history. *Id*. at 1313.

While claims are to be read in view of the specification, a fundamental cannon of claim construction is that limitations from the specification cannot be read into the claims. There is a distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim. *Phillips*, 415 F.3d at 1323; *see also Comark*, 156 F.3d at 1186-87. "[F]or instance, although the specification often describe very specific embodiments of the invention, we have repeatedly warned against confining the claim to those embodiments." *Phillips,* 415 at 1323. In *Phillips*, the Federal Circuit, sitting *en banc*, reflected on its precedent and observed that it had expressly rejected the contention that if a patent describes only a single embodiment,

that the claims of the patent must be construed as being limited to that embodiment. *Id.*

### B. Construction of Claim Terms in the '609 Patent

Below is Jennings' proffered claim construction for each of the disputed claim terms appearing in the JCCS. In some cases, similar claim terms are grouped together for convenience.

#### 1. "Change-over linkage" appearing in claims 1, 4, 5, 7, and 12; and "right-to-left change-over linkage" appearing in claim 11

**Jennings' Proposed Construction:** **A mechanism or system for transmitting motion from the gear selection mechanism to the shift lever of a transmission for the purpose of changing the connection of the gear selection mechanism to the transmission from one side (the right side) to the other side (the left side).**

Jennings' proposed construction for "change-over linkage" is consistent with how the term is used in the claims, comports with the ordinary and customary meaning of the term, and is in harmony with the written specification.

Claim construction begins with the language of the claims. *Comark*, 156 F.3d at 1186. *See also, Phillips*, 415 F.3d at 1314 (the claims themselves provide substantial guidance as to the meaning of particular

claim terms, and the context in which a term is used can be highly instructive in determining the meaning of the term). This is the most fundamental cannon of claim construction. This Court recognizes the importance of this cannon of claim construction. In the Court's Special Procedures Order for Cases Under 28 U.S.C. § 1498(a), the Court reminded the parties that a claim construction of a term in isolation, and without regard to its use in context in the claim, is discouraged. (D. 28) Indeed, the Court went on to state: "[t]hus a complete, and more persuasive, proposed construction will always consider the context in which a term appears in the disputed claim." D. 28, ¶ 6(b)(ii).

Claim 1 illustrates the use of the term "change-over linkage":

> A change-over linkage in combination with a replacement transmission installed in a right hand drive vehicle wherein the original transmission with a right side shift lever is replaced with a replacement transmission with a left side shift lever, said change-over linkage serving to transfer gear selection information emanating from the driver's gear selector lever across the vehicle from the right side to the shift lever located on the left side of the replacement transmission and comprising:
>
> an elongate member transversely spanning the replacement transmission, said elongate member having first and second ends that are rotatably supported;
>
> means proximate the first end of said elongate member connecting the gear selection mechanism of the vehicle to said elongate member for imparting rotational movement to the

member in response to the driver's selection of gear; and

means proximate the second end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongate member to movement operating the shift lever of the replacement transmission.

Claim 1 requires that the "change-over linkage" transfers gear selection information from the driver's gear selector lever, located on the right side of the vehicle, across the vehicle to the shift lever located on the left side of the replacement transmission. Other claims, including claims 5, 7, 11 and 12, impose this same requirement on the "change-over linkage". Thus, from the context of the claims, the "change-over linkage" works between the right side gear selection mechanism and the left side shift lever of the replacement transmission. Functionally, the "change-over linkage" transmits the motion of the right side gear selection mechanism to the left side shift lever of the replacement transmission. Thus, construing "change-over linkage" in the context of the claims, "change-over linkage" simply means a mechanism for transmitting motion from the right side gear selection mechanism to the left side shift lever of the replacement transmission.

Jennings' proposed construction for "change-over linkage" is consistent with the ordinary and customary meaning of the term as

understood by a person of ordinary skill in the art. The ordinary meaning of "change-over linkage" is its meaning to a skilled artisan after reading the entire '609 patent. *Phillips*, 415 F.3d at 1321. The technology involved is not complex, and can easily be understood by a layperson. Indeed, the ordinary and customary meaning of all claim terms at issue in this case, as understood by skilled artisans, will be readily apparent to the Court, and claim construction will involve little more than the application of widely accepted meanings of commonly understood words. *Id*. at 1314; *see also Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that claims do not require elaborate interpretation).

A linkage is simply a mechanism for transmitting motion from one point to another point. Common examples are the hand actuated brake cable linkage on a bicycle, and the linkage forming a part of a vice grip pliers. "Change-over" is simply a term chosen by the inventors to describe the function of the linkage. After all, in order for the right hand postal vehicle to accept a left hand replacement transmission, it is necessary to "change" how the motion of the gear selection mechanism is transmitted to the left side shift lever of the replacement transmission. Accordingly, the inventors used the word "change-over" and used it to modify linkage. Hence the term "change-over linkage." Thus, the ordinary meaning of

"change-over linkage", is a mechanism or system for transmitting motion from the right side gear selection mechanism to the left side shift lever of the replacement transmission.

This construction of "change-over linkage" is consistent with the written specification. In the "Summary of the Invention", the '609 patent states that the "change-over linkage" enables an inadequate (faulty) transmission in a right hand vehicle to be replaced by a better transmission designed for a left hand vehicle. (App. 9, col. 2, ll. 1-5). Further, the written specification states that the "change-over linkage" enables the shift rod (which in the exemplary embodiment shown forms a part of the gear selection mechanism) to be connected to the shift lever on the replacement transmission. *Id.*, col. 1, ll. 7-15. At column 3, lines 12-27, the written specification describes replacing the original right hand transmission 26 with a left hand replacement transmission 40, and notes that this results in the shift lever 128 of the replacement transmission being disposed remote from the shift rod 18 that again, in the exemplary embodiment, forms a part of the gear selection mechanism. (App. 10). Then, the written specification provides that the components are operatively connected by the "change-over linkage" 70. *Id.*, col. 3, ll. 28-30. "Change-over linkage" is repeatedly referred to throughout the specification of the '609 patent, and all

references are consistent with how the term is used in the claims. In the end, the written specification supports Jennings' proposed construction, i.e., "change-over linkage" is a mechanism for transmitting the motion of the right side gear selection mechanism to the left side shift lever on the replacement transmission.

The prosecution history of the '609 patent (App. 13 - 119), which forms a part of the intrinsic evidence, is not particularly instructive since there was no prior art rejections, and no argument made by the inventors distinguishing their claimed invention from the prior art.[1] Specifically, the Patent Office did not construe the "change-over linkage" term. Generally, the purpose in consulting the prosecution history is to determine if the inventor disclaimed or disavowed an interpretation of a claim in the course of advocating patentability. *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005). Jennings, did not disclaim or disavow any interpretation for "change-over linkage," or any other claim term for that matter.

The Court need not consider dictionary definitions to construe "change-over linkage." In *Phillips*, the Federal Circuit went to great lengths to caution against the indiscriminate and routine use of extrinsic evidence,

[1] The Patent Office did reject original claims 1-6 under 35 U.S.C. §112 as being indefinite. This rejection was overcome by amending the claim to address the indefiniteness concerns of the Patent Office.

particularly dictionaries, in construing claims. *See Phillips*, 415 F.3d at 1317-1324. The Federal Circuit held that extrinsic evidence is less reliable than intrinsic evidence, which is made up of the patent and its prosecution history. However, the Federal Circuit noted that the reliability of extrinsic evidence is enhanced if considered in the context of intrinsic evidence. *Id.* at 1318-19. In the case of dictionaries, the *Phillips* court made it clear that a dictionary definition for a claim term cannot contradict the intrinsic evidence, i.e., the patent documents. *Id.* at 1322-23. The construction of "change-over linkage" is clear from the intrinsic evidence. However, a construction that considers a dictionary definition in the context of the '609 patent is consistent with Jennings' proffered construction. "Linkage" means a system of interconnected machine elements, such as rods, springs and pivots, used to transmit power or motion. (App. 120). When this definition is considered in context with the claim language, the written specification, and the meaning of "change-over," the resulting construction of "change-over linkage" squares with Jennings' proposed construction. That is, "change-over linkage" means a mechanism or system for transmitting motion from the right side gear selection mechanism to the left side shift lever of the replacement transmission.

**2. "Gear selection mechanism" appearing in claims 1, 5, 7, 11 and 12**

__Jennings' Proposed Construction:__ **Two or more movable parts in a vehicle that are actuated by the driver, and which are operative to select a gear.**

Claim 5 is exemplary of the use of the term "gear selection mechanism":

> A change-over linkage for use in a transmission replacement operation for a right hand drive vehicle wherein the original transmission having a right side shift lever is replaced with a replacement transmission having a left side shift lever, said change-over linkage serving to transversely span the replacement transmission and operatively connect the right side gear selection mechanism of the vehicle to the left side shift lever on the replacement transmission, said change-over linkage comprising:
>
> a right side support member;
>
> a left side support member;
>
> an elongate member supported for rotational movement at its right and left ends, respectively, by said right and left support member;
>
> means proximate the right end of said elongate member for connecting the gear selection mechanism of the vehicle to the elongate member for imparting rotational movement to the elongate member in response to the driver's selection of gear; and
>
> a multicomponent assembly proximate the left end of said elongate member for connecting the elongate member to the sift lever of the replacement transmission, said multicomponent assembly comprising a first component projecting from said elongate member and at least on additional link pivotally connected to the

> first component, said at least one additional link attaching to the shift lever to convert rotational movement of the elongate member to movement operating the shift lever.

The "gear selection mechanism" is actuated by the driver. The change-over linkage is operated in response to the driver actuating the "gear selection mechanism." When the driver actuates the "gear selection mechanism," the change-over linkage transfers the motion of the "gear selection mechanism" to the left side shift lever on the replacement transmission. The "gear selection mechanism" actually selects a gear in the replacement transmission.

Like all of the claim terms discussed herein, the "gear selection mechanism" is not technically complex and its meaning, as understood by the skilled artisan, is readily apparent to the Court. Construing "gear selection mechanism" involves little more than the application of well known meanings to common words. *Phillips*, 415 F.3d at 1314. Everyone that has driven a vehicle has actuated a "gear selection mechanism" by moving the gear lever from "park" to "drive". Jennings' proposed construction is consistent with the ordinary meaning of the term.

Jennings' construction is also consistent with the '609 patent and its written specification. The specification teaches linking the "gear selector

mechanism" with the replacement transmission.[2] See "Summary of the Invention," (App. 9, col. 1, ll. 56-67 and col. 2, ll. 1-5). A person skilled in the art viewing the drawings along with studying the specification will understand that the "gear selection mechanism" includes two or more movable parts in a vehicle that is actuated by the driver to select a gear.

The prosecution history is not particularly instructive for the same reasons discussed above with respect to "change-over linkage." Further, there is little need, if any, to consult a dictionary as the intrinsic evidence makes clear the proper construction. Regardless, considering a dictionary definition in this case reveals the soundness of Jennings' proposed construction. *McGraw-Hill Dictionary of Scientific and Technical Terms* defines "mechanism" as "[t]he part of a machine which contains two or more pieces so arranged that the motion of one compels the motion of the other." (App. 121 – 123). Viewed in the context of the '609 patent, and the obvious meaning of "gear selection", a resulting construction based on the dictionary meaning of "mechanism" is entirely consistent with Jennings' proposed construction and the intrinsic record.

---

[2] The inventors of the '609 patent use "gear selector mechanism" and "gear selection mechanism" interchangeably.

**3. "Shift lever of the replacement transmission" appearing in claims 1, 5, 7, 11 and 12**

**<u>Jennings' Proposed Construction:</u> A moveable lever or arm associated with the replacement transmission for shifting gears within the transmission.**

There should be no dispute as to the construction of this term. In the context of the claims the "shift lever" is the arm associated with the replacement transmission for shifting gears in the transmission. Thus, as the "shift lever" is moved back and forth with respect to the replacement transmission, the gears within the transmission are shifted or changed.

This construction is in harmony with the written specification. See '609 patent, including the "Abstract," "Field of the Invention," and '609 patent, col. 2, ll. 18-33 and 63-67, and col. 3, ll. 11-38 and ll. 56-63. (App. 1, 9, & 10). The written specification teaches that the "shift lever," referred to by numeral 128 in Figure 2A of the drawings of the '609 patent, is a lever or arm associated with the replacement transmission for shifting gears in the transmission.

**4. "Said elongated member having first and second ends that are rotatively supported" appearing in claim 1; and "An elongated member supported for rotational movement at its right and left ends" appearing in claims 5 and 7**

**<u>Jennings' Proposed Construction</u>: This means that end portions of the elongated member are rotatively supported. It does not mean that the extreme ends are held in a support structure.**

This section of Jennings' brief addresses both claim terms. In the JCCS (App. 124 - 156), each of these claim terms or phrases were addressed separately, the first appearing in Section II.D, App. 134 -135, and the second appearing in Section II.H, App. 140-141. The claim construction issue, however, is the same for both. In particular, the issue focuses on the proper construction of the term "ends" in the context of the claim, and more particularly, whether these claims require the elongated member to be supported at the extreme or terminal ends of the elongated member as advanced by the Government.

Although claim construction begins with the claims themselves, the claims do not stand alone. Claims must be read in view of the specification of which they are a part. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). The drawings, of course, form a part of the written specification and reviewing

the drawings of the '609 patent leads a person of ordinary skill in the art to conclude that "ends" refers to an end portion of the elongated member. Figure 2A of the '609 patent appears below:

FIG. 2A




The elongated member 110 that extends under the replacement transmission 40 is rotatively supported by two L-shaped brackets 100 and 106, and grommets 104 and 112. Note where opposite end portions, designated by 110A and 110B, project through the grommets 104 and 112 and extend outwardly past where brackets 110 and 116 support the elongated member 110.[3] Thus, the elongated member in the preferred embodiment is not rotatively supported at the extreme or terminal end. To the contrary, the elongated member 110 is supported inwardly of the terminal ends of the elongated member. From Figure 2A, it is clear that the

[3] Designations 110A and 110B do not appear in the drawings of the '609 patent. They are added above to Figure 2A to illustrate that the elongated member 110 is not supported on its extreme ends.

end portions of the elongated member 110 are rotatively supported and not the extreme ends.

Moreover, the ordinary meaning of "end" or "ends", viewed in the context of the '609 patent, is constructive. When a family member having dinner at an elongated table says "please pass me the potatoes at the end of the table," she is not likely referring to a bowl of potatoes situated on the extreme end of the table. Rather, she is most likely referring to a bowl of potatoes sitting on an end sectional or end portion of the table.

Extrinsic evidence, including dictionary definitions, is not needed to arrive at a sensible and reliable construction. Indeed the *Phillips* court in effectively reversing *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) noted that one of the problems with dictionaries is that they contain somewhat different sets of definitions for the same words. *Phillips*, 415 F.3d at 1322. That is precisely the case with a word like "end". See App. 157 – 167. A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the Court's independent decision, uninformed by the specification, to rely on one dictionary rather than another. *Id.* at 1322.

However, even the dictionary definition of "end", provides that "end" means a part or place at or *adjacent* an extremity, such as at the end of the

table or the west end of town. (App. 157) Here the dictionary definition of "ends," as viewed in the context of the '609 patent, squares with Jennings' proffered construction.

As the JCCS shows, the Government seeks a construction that requires the elongated member to be rotatively supported at one particular place - on the extreme or terminal ends of the elongated member. In other words, the Government elicits a claim construction that would enable the Government and its vendors to avoid infringement by simply placing the supports for the elongated member slightly inwardly from the terminal ends of the elongated member. The '609 claims simply do not have any such limitation. The Government's proffered construction is indeed odd. Its construction does not even encompass the design shown in the '609 patent. Hardly ever is a claim construction correct that does not encompass the preferred embodiment. *Phillips,* 415 F.3d at 1323.

**5. "Means proximate the first end of said elongate member connecting the gear selection mechanism of the vehicle to said elongate member for imparting rotational movement to the member in response to the driver's selection of gear" appearing in claim 1**

Jennings and the Government agree on the construction of the claimed function:

> Imparting rotational movement to the member in response to the driver's selection of a great

*See* App. 125, ¶ I.B.

**<u>Jennings' Proposed Construction of the Corresponding Structure</u>: The structure disclosed in the specification for performing the claimed function is link 120.**

The parties agree that this element of claim 1 is written in what is termed "means plus function" ("MPF") language. Construction of a MPF limitation includes two steps. First, the Court must construe the function of the MPF limitation to include the limitations contained in the claim language, and only those limitations. *Telemac Cellular Corp. v. Topp Telecom Inc.*, 247 F.3d 1316, 1324 (Fed. Cir. 2001). After identifying the claimed function, the court must then determine what structure disclosed in the specification corresponds to the claimed function. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 249 F.3d 1314, 1324 (Fed. Cir. 2001).

Jennings and the Government agree on the claimed function. The claimed function is only "imparting rotational movement to the member in response to the driver's selection of gear." In terms of the corresponding disclosed structure, both Jennings and the Government agree that such includes link 120. See Figure 4, *infra*, of the '609 patent. However, the Government goes further and maintains that the corresponding structure

also includes the bolt opening 124 provided in the link 120. Bolt opening 124 performs a different function. It enables link 120 to be connected to the gear selection mechanism, and hence, does not actually perform the claimed function.

In determining the corresponding structure in the course of construing MPF language, the focus must always be on the claimed function. Structural features that do not actually perform the claimed function do not constitute corresponding structure and do not serve as claim limitations. *Asyst Techs. Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001). Opening 124 formed in link 120 connects to the gear selection mechanism, but the claimed function, agreed upon by the parties, says nothing about connecting the means to the gear selection mechanism. Indeed, the paragraph containing the MPF element addresses the connecting function outside of the claimed function. Specifically, the claim states: "means proximate the first end of said elongated member connecting the gear selection mechanism of the vehicle to said elongated member….." Then the claim goes on to recite the agreed upon function, namely "for imparting rotational movement to the member in response to the driver selection of gear." Thus, the claims address the connection feature of the means before the function is actually recited.

Effectively, the parties agree that the portion of the claim that includes "means proximate the first end of said elongated member connecting the gear selection mechanism of the vehicle to the elongated member" does *not* form a part of the claimed function. Hence, opening 124 that facilitates connecting link 120 to the gear selection mechanism cannot form the corresponding structure. The corresponding structure must actually perform the claimed function, not merely enable the pertinent structure to operate as intended. *Asyst*, 268 F.3d at 1371.

**6. "Means proximate the right end of said elongated member for connecting the gear selection mechanism of the vehicle to the elongated member for imparting rotational movement to the elongated member in response to the driver's selection of gear" appearing in claims 5 and 7**

The parties agree on the construction of the claimed function: connecting the gear selection mechanism of the vehicle to the elongated member for imparting rotational movement to the elongated member in response to a driver's selection of gear.

**<u>Jennings' Proposed Construction of the Corresponding Structure</u>: The structure disclosed in the specification for performing this function is the link 120.**

The claimed function and corresponding structure of this MPF element is essentially the same as the preceding MPF element appearing

in claim 1. Link 120 connects to the gear selection mechanism and imparts rotational movement to the elongated member in response to the driver's selection of a gear. While other associated structures may enable the pertinent structure to operate as intended, they are unnecessary to the basic claimed function. *Asyst*, 268 F.3d at 1371.

**7. "Means proximate the second end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongate member to movement operating the shift lever of the replacement transmission" appearing in claim 1**

The parties are in agreement as to the claimed function. The claimed function is "connecting the elongated member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongated member to movement operating the shift lever of the replacement transmission." *See* App. 125, ¶ I.C.

**Jennings' Proposed Construction Relative to the Corresponding Structure: The structure disclosed in the specification for performing the claimed function is link 130.**

Section 112, ¶ 6 does not permit incorporation of structure from the written specification beyond that necessary to perform the claimed function. *Micro Chemical Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250 at

1258 (Fed. Cir. 1999). The means called for here simply *links* the elongated member with the shift lever of the replacement transmission. Certainly, the structure referred to by the numeral 130 links the elongated member with the shift lever of the replacement transmission. Further, while there are numerous definitions for "connecting" or "connection", the *American Heritage Dictionary* sets forth one definition of "connection" as: "[a]nything that joins, relates or connects; a bond; a link." (App. 168 – 170).

Jennings appreciates that there is another structure attached to link 130 and that this other structure may enable the system to work as intended. However, that is not the test for the corresponding structure of the means. *Asyst*, 268 F.3d at 1371 (the corresponding structure must actually perform the claimed function, not merely enable the pertinent structure to operate as intended). It is acknowledged that the claimed function calls for "connecting the elongated member to the shift lever of the replacement transmission....." This does not require a *direct* connection - the connection can be indirect. After all the words of functional language in an MPF claim is subject to claim construction, and ordinary principles of the claim construction governs the interpretation of claim language used to describe the function. Thus, it is appropriate to construe "connecting" and determine if "connecting" requires a *direct* physical attachment or an

*indirect* connection. To a person of ordinary skill in the art viewing the '609 patent, the word "connecting" or "connection" means link.

**8. "At least one additional length pivotally connected to the first component" appearing in claims 5 and 7**

**<u>Jennings' Proposed Construction</u>: This claim term means that the additional link can rotate with respect to the first component.**

It appears that Jennings and the Government agree on the construction of this term. The Government's proposed construction is:

> the 'at least one additional link must be connected to and pivot relative to the 'first component.' This claim language does not address the movement of the additional link relative to the 'elongated member.'

App. 143, ¶ II.J.

Jennings agrees that the claim language does not address the movement of the "additional link" relative to the elongated member. Jasper has proposed the following construction:

> this limitation requires that the 'at least one additional link pivotally connected to the first component' be capable of pivoting about the elongated member together with the 'first component projecting from said elongated member.'

*Id.*

Nothing in claims 5 or 7 state anything about the additional link pivoting "about" the elongated member. Indeed, claims 5 and 7 call for the additional link to be pivotally connected to the first component - not to the

elongated member. No reading of claims 5 or 7 supports Jasper's construction.

Consulting the written specification confirms Jennings' construction. Figure 4 of the '609 patent is reproduced below:




FIG. 4

The relevant portions of claims 5 and 7 is as follows:

> a multicomponent assembly proximate the left end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission, said multicomponent assembly comprising a first component projecting from said elongate member and at least on additional link pivotally connected to the first component, said at least one additional link attaching to the shift lever to convert rotational movement of the elongate member to movement operating the shift lever.

Considering the above element of claims 5 and 7 in the context of the written specification, the multi-component assembly referred to is disposed on the left hand side of the elongated member 110 as shown in Figure 4.

Claims 5 and 7 state that the multicomponent assembly includes a first component projecting from said elongated member. This first component in the exemplary embodiment is link 130. Further, this portion of claims 5 and 7 calls for the multicomponent assembly to include "at least one additional link pivotally connected to the first component." This additional link in the exemplary embodiment is link 134. This additional link is *not* pivotally connected to the elongated member 110. It is simply pivotally connected to the first component 130.

**9. "Kit" appearing in claim 7**

**<u>Jennings' Conditional Proposed Construction</u>: First, a claim construction is not required for kit. The term "kit" appears in the preamble of claim 7 and is non-limiting. The term "kit" as used in claim 7 means a set of parts to be assembled. Individual parts of the kit may comprise an assembly.**

Claim 7 is as follows:

> A kit for use in replacing the transmission of a right hand drive vehicle that has a right side gear selection mechanism and a right side shift lever on the transmission with a replacement transmission having a left side shift lever, said kit comprising:
> a replacement transmission with left side shift lever and associated torque converter;
> a drive shaft having the correct length to accommodate the dimensions of the replacement transmission when installed; and

a change-over linage comprising
a right side support member;
a left side support member;
an elongate member supported for rotational movement at its right and left ends, respectively, by said aright and left support members;
means proximate the right end of said elongate member for connecting the gear selection mechanism of the vehicle to the elongate member for imparting rotation movement to the elongate member in response to the driver's selection of gear; and
a multicomponent assembly proximate the left end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission, said multicomponent assembly comprising a first component projecting from said rotation member and at least one additional link pivotally connected to the first component, said at least one additional link attaching to the shift lever to convert rotational movement of the elongate member to movement operating the shift lever.

Jennings offers a conditional construction because the "kit" term is *not* a limitation of claims 7-10. In these claims the term "kit" only appears in the preamble, and not the body of the claims. As discussed below, terms in the preamble of a claim are generally non-limiting.

A claim has two basic parts - a preamble and a body. Usually, there is a transition word or phrase that separates the preamble from the body. In the case of claim 7, the transition word is "comprising." Language

appearing before "comprising" constitutes the preamble of the claim, and language appearing after "comprising" constitutes the body of the claim.

Generally, the preamble does not limit the claims. *O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). Where a preamble term serves as a convenient label for the invention as a whole, as "kit" does in this case, it does not limit claim scope. *Storage Tech. Corp. v. Cisco Sys. Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003). In the case of claim 7, the term "kit" is a convenient label to describe the structure described in the body of the claim.

The patentability of claim 7 did not depend on the inventor using the word "kit". Claims of comparable scope, even claims of broader scope, were obtained without utilizing the "kit" term. In addition, the term "kit" is not mentioned in the body of claim 7 and does not provide antecedent basis for ensuing claim terms in the body of the claim. This is not a case where the term "kit" as used in the preamble recites essential structure or is necessary to give life, meaning and vitality to the claim. Indeed, the preamble and the term "kit" is not limiting here because the body of the claim defines a structurally complete invention.

For the above reasons, it is urged that the term "kit" is non-limiting. Accordingly, if the Court so finds, there is no need to construe the term

because it presents no infringement issues. All that is required to infringe claim 7, for example, is that the accused product meet only the limitations found in the body of claim 7.

Notwithstanding, if the Court deems it necessary to construe "kit", Jennings' construction is consistent with the claims, the written specification and the ordinary meaning of "kit".

Claim 7 states that the "kit" comprises a group of parts including a replacement transmission, a drive shaft, a change-over linkage which includes a series of parts including a right side support member, left side support member, etc. These are parts of the kit, and as the specification and drawings teach these parts are to be assembled and installed into a vehicle. Figure 2A of the '609 patent, *supra*, shows some of the parts of the kit assembled and installed in a vehicle. Note the replacement transmission 40, and the change-over linkage assembled and operatively connected to the replacement transmission. Thus, the written specification, including the drawings, supports Jennings' proposed construction.

Moreover, "kit" is a word with a simple meaning. Its ordinary and customary meaning is consistent with Jennings' proffered construction. Whether one is referring to a toy airplane kit, a trim kit for an appliance such as a microwave oven, or a car kit purchased by an adult automobile

enthusiast, the ordinary meaning is the same - a set of parts to be assembled. Here, if a construction is called for, the intrinsic evidence along with the ordinary meaning is sufficient to yield a proper claim construction. But even if a dictionary definition is consulted, most likely that definition is consistent with the Jennings' proffered construction. In the context of the '609 patent, the term "kit" means a set of parts or materials to be assembled, such as a model airplane kit. (App. 171)

**10. "Connecting" appearing in claims 1, 5, 7, 11 and 12**

**Jennings' Proposed Construction: "Connecting" in the context of the claims means that certain elements of the claim are linked. "Connecting", as used in the '609 patent, means that the elements are joined or linked directly or indirectly.**

Claim construction begins with the claims. Nowhere in the claims do the inventors limit "connecting" to "directly connecting." "Direct" or "directly" does not appear in the claims in conjunction with "connecting."

"Connecting" is a broad word frequently used in patent parlance by patent practitioners to described a coupled, joined, or linked relationship between two components. Usually it is not meant to suggest or mean that a hard and fixed physical connection exists between components. In the claims at issue, the object of the structure claimed is to transfer motion

from the right side gear selection mechanism to the left side shift lever of the replacement transmission. To accomplish this, the change-over linkage is linked or connected between the right side gear selection mechanism and the left side shift lever of the replacement transmission. When the driver moves the gear selection mechanism from "park" to "drive" for example, the motion generated by the driver must be transmitted from the gear selection mechanism on the right side of the vehicle, down to the replacement transmission and around the transmission to the left side shift lever.

The ordinary meaning of "connecting" as used in the '609 patent does not require a direct connection. The claim terms do not stand alone. Claims must be read in view of the specification of which they are a part. *Phillips*, 415 F.3d 1315. "Connecting", "connect" and "connected" are used throughout the written specification. Instructive here is that in some cases the written specification simply uses the term "connected directly" and in other cases the written specification uses "connected" or "connecting". For example, the written specification teaches:

> At the first end of rod 110, adjacent to plate 74 and L-member 100, is a first link 120 that is fixedly secured to rod 100. Link 120 includes an opening 124 that connects directly to shift rod 18 so that the driver's changing of gears through the gear selector lever in the driver's

> compartment may be mechanically transmitted to rod 110 as rotational movement of the rod. (emphasis added)

App. 10, col. 3, ll. 49-55.

> A multicomponent assembly is mounted proximate the opposite end of rod 110 for connecting rod 110 to shift lever 128 of replacement transmission 40 in such a way that rotational movement of rod 110 serves to operate the shift lever. This assembly comprises a first component 130 that is fixedly secured to rod 110 by welding or the like, and respective pivotally connected links 134 and 138. Opening 140 in link 138 connects directly to shift lever 128. (emphasis added)

App. 10, col. 3, ll. 56-63.

Normally claim terms are used consistently throughout the patent. *Phillips*, 415 F.3d at 1314. Claims must be construed consistent with the written specification. Consistency requires that if "connecting" required a direct connection, then the claims would have stated that just as stated in the written specification.

**11. The Government's contention that method claim 11 should be construed to require a sequence or order limitation**

**Jennings' Response: The method of claim 11, and the method of claim 12 which depends from claim 11, are not restricted to any particular sequence and particularly the replacement transmission does not have to be secured in place prior to installing the right to left change-over linkage.**

The Government urges the Court to rewrite claims 11 and 12 to limit certain method steps in the claims to a particular sequence. Specifically the Government urges the Court to construe claim 11 such that literal infringement can be avoided by simply installing the change-over linkage on the replacement transmission *prior* to the replacement transmission being secured in place. This construction is contrary to claim construction law, and inconsistent with the claims of the '609 patent.

The law relative to imposing sequence limitations on a method claim is clear. Unless the steps of a method expressly require an order, the steps are not normally construed to require one. *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1369 (Fed. Cir. 2003); *see also Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001).

There are no sequence limitations in claim 11. The six steps recited are not preceded with any language dictating sequences, such as "first removing, secondly raising, thirdly connecting," and so forth and so on. Nor are any of the steps preceded with terms like "after," "before," etc. Claim construction begins with the words of the claims, and claim 11 includes no sequence limitation.

Common sense suggests that the original transmission and original drive shaft should be removed before securing the replacement

transmission in place and installing a drive shaft having the correct length. However, it is not *these* steps for which the Government seeks to import a sequence limitation. Rather, the Government seeks a construction that requires the replacement transmission to be secured in place before the change-over linkage is installed. Hence, if at least a portion of the change-over linkage is secured to the replacement transmission prior to the transmission being secured in place, under the Government's proposed construction, claim 11 would not be infringed.

The fifth step in claim 11 recites: "installing a right to left change-over linkage operatively connecting the right side gear selection mechanism of the vehicle to the left side shift lever of the replacement transmission." This language simply means that in installing the right to left change-over linkage, that this will operatively connect the gear selection mechanism to the shift lever of the replacement transmission. No sequence limitation is expressed or implied.

The written specification at column 4 does provide a fairly detailed procedure for installing the transmission replacement kit. However, this portion of the written description teaches - not claims. It aims at complying with 35 U.S.C. §112 (1975) and providing an enabling and best mode disclosure.

Claims are not ordinarily limited to the scope or details disclosed in a preferred embodiment. *Altiris*, 308 F.3d at 1370. One of the most fundamental cannons of claim construction is that limitations in the specification are not to be imported into the claims. *Phillips*, 415 F.3d at 1323-24. This basic principle of claim construction applies with equal force to attempts seeking to import a sequence or order limitation from the specification into a method claim. Just as in *Altris*, the written description of the '609 patent discloses a single preferred embodiment where the change-over linkage installation step follows the step of securing the replacement transmission in place. Nowhere, however, is there any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps. *See Altris*, 318 F.3d at 371. Claim 11 should be construed to permit the installation of the change-over linkage to occur at any time.

This the 6th day of March, 2007.

**COATS & BENNETT PLLC**
**Attorneys for Plaintiff**

By: ______________________________
Larry L. Coats
N.C. State Bar No. 5,547

Anthony J. Biller
N.C. State Bar No. 24,117
1400 Crescent Green, Suite 300
Cary, North Carolina 27518
Telephone No.: (919) 854-1844
Facsimile No.: (919) 854-2084

## CERTIFICATE OF SERVICE

I certify that on this day, the 6th of March, 2007, a true and correct copy of the foregoing **JENNINGS' OPENING BRIEF ON CLAIM CONSTRUCTION** was served via the CM/ECF system to the following addresses:

Ken B. Barrett, Esq.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
ken.barrett@usdoj.gov
*Attorney for Defendant United States Post Office*

James M. Hinshaw, Esq.
Bingham McHale LLP
2700 Market Tower
10 West Market Street
Indianapolis, Indiana 46204-4900
jhinshaw@binghammchale.com
*Attorney for Defendant Jasper*

James S. Ward
Ward & Wilson, LLC
2100 Southbridge Parkway, Suite 580
Birmingham, Alabama 35209
jward@wardwilsonlaw.com
*Attorney for Defendant Ready Built*

By: Larry L. Coats
Attorney for Plaintiff