# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JENNINGS TRANSMISSION
SERVICE OF GOLDSBORO, INC.,
Plaintiff,

v.

THE UNITED STATES,
Defendant,

and

JASPER ENGINES & TRANSMISSIONS,
Third-Party Defendant,

and

READY BUILT DISTRIBUTORS, INC.,
Third-Party Defendant.

No. 05-1209 C

Judge Lawrence M. Baskir

## THE UNITED STATES' CLAIM CONSTRUCTION BRIEF

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

KEN B. BARRETT
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0343
Facsimile: (202) 307-0345
E-mail: ken.barrett@usdoj.gov

Attorneys for the United States

OF COUNSEL:
GARY L. HAUSKEN
Assistant Director
Department of Justice

March 23, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS FOR THE APPENDIX . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. The Law of Claim Construction . . . . . . . . . . . . . . . . . . . . . . . . 3

B. The Government's Proposed Construction of the Claim Terms and Phrases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1. "change-over linkage" of asserted claims 1, 5, 7, 11 & 12; "right-to-left change-over linkage" of claim 11; and "the change-over linkage" of claim 12 . . . . . . . . . . . . . . . . . . 7

2. "gear selection mechanism" of claims 1, 5, 7, 11 & 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3. "shift lever of the replacement transmission" of asserted claims 1, 5, 7, 11 & 12 . . . . . . . . . . . . . . . . . . . . . . . . 17

4. "said elongate member having first and second ends that are rotatably supported" of claim 1, and "an elongate member supported for rotational movement at its right and left ends" of claims 5 and 7 . . . . . . . . . . . . . . . . . . . . . 20

5. "means proximate the first end of said elongate member connecting the gear selection mechanism of the vehicle to said elongate member for imparting rotational movement to the member in response to the driver's selection of gear" of claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

6. "means proximate the right end of said elongate member for connecting the gear selection mechanism of the vehicle to the elongate member for imparting rotational movement to the elongate member in response to the driver's selection of gear" of claims 5 and 7 . . . . . . . . . . . . . . . . . . . . . . 27

7. "means proximate the second end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongate member to movement operating the shift lever of the replacement transmission" of claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

8. "at least one additional link pivotally connected to the first component" of claims 5 and 7 . . . . . . . . . . . . . . . . . . . . 32

9. "kit" of claim 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

10. "connecting" of claims 1, 5, 7, 11 and 12 . . . . . . . . . . . 36

11. "said method comprising the steps of . . ." of claim 11 and "The method of claim 11" of claim 12 . . . . . . . . . . . . . . . 37

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF CONTENTS FOR THE APPENDIX


A. U.S. Patent No. 6,085,609 to Mozingo et al. . . . . . . . . . . . . . . . DA1

B. Patent Application Serial No. 09/032,960 . . . . . . . . . . . . . . . . DA13

C. Office Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DA43

D. U.S. Patent No. 4,630,702 to Irimajiri et al. . . . . . . . . . . . . . . DA48

E. Information Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . DA52

F. U.S. Patent No. 4,281,562 to Venuto . . . . . . . . . . . . . . . . . . . DA56

G. U.S. Patent No. 4,267,743 to Tanaka . . . . . . . . . . . . . . . . . . . DA61

H. U.S. Patent No. 5,372,050 to Shinki et al. . . . . . . . . . . . . . . . DA69

I. The Service Manual for the "1987-1992 U.S. Postal Service Long Life Vehicle," copyright 1991 (selected excerpts) . . . . . . DA90

J. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1997) (selected excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DA94

# TABLE OF AUTHORITIES

## CASES

Altiris, Inc. v. Symantec Corp.,
318 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

Amgen Inc. v. Hoechst Marion Roussel, Inc.,
314 F.3d 1313 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Asyst Techs. Inc. v. Empak, Inc.,
268 F.3d 1364 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

B. Braun Med., Inc. v. Abbott Labs.,
124 F.3d 1419 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 7, 25, 28

Gemstar-TV Guide Int'l, Inc. v. International Trade Comm'n,
383 F.3d 1352 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 26, 32

Honeywell Int'l, Inc. v. ITT Industs., Inc.,
452 F.3d 1312 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,
381 F.3d 1111 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Interactive Gift Express, Inc. v. Compuserve Inc.,
256 F.3d 1323 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

JVW Enterprises, Inc. v. Interact Accessories, Inc.,
424 F.3d 1324 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . 6, 24, 28, 30

Loral Fairchild Corp. v. Sony Corp.,
181 F.3d 1313 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Mantech Envtl. Corp. v. Hudson Envtl. Services, Inc.,
152 F.3d 1368 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Norian Corp. v. Strykker Corp.,
363 F.3d 1321 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Nystrom v. Trex Co., Inc.,
424 F.3d 1136 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 36

O.I. Corp. v. Tekmar Co., Inc.,
115 F.3d 1576 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

On Demand Mach. Corp. v. Ingram Indus., Inc.,
442 F.3d 1331 (Fed. Cir. 2006),
cert. denied, 127 S.Ct. 683 (2006) . . . . . . . . . . . . . . . . 5, 8, 33, 36-37

Phillips v. AWH Corp.,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) . . . . . . . . . . . . 3-5, 34, 36

Searfoss v. Pioneer Consol. Corp.,
374 F.3d 1142 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,
279 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United Carbon Co. v. Binney & Smith Co.,
317 U.S. 228 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

In re Venezia,
530 F.2d 956 (C.C.P.A. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Vitronics Corp. v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,
442 F.3d 1322 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES

28 U.S.C. § 1498(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

35 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

35 U.S.C. § 112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

# THE UNITED STATES' CLAIM CONSTRUCTION BRIEF

Pursuant to the Order filed February 12, 2007, Defendant, the United States, hereby submits its claim construction brief and responds to "Jennings' Opening Brief on Claim Construction," filed March 6, 2007 ("Pl.'s Cl. Const. Br.").

## I. INTRODUCTION

This is a suit brought under 28 U.S.C. § 1498(a) by Jennings Transmission Service for the alleged use or manufacture by or for the United States Postal Service (USPS) of certain patented devices and processes relating to replacement transmission kits for right-hand drive postal vehicles. Jennings asserts infringement of claims 1, 5, 7, 11 and 12 of U. S. Patent No. 6,085,609 (the '609 patent). Joint Claim Construction Statement and Joint Status Report filed January 19, 2007 (hereinafter "JCCS"), at 2. The two suppliers of accused devices, Jasper Engines & Transmissions and Ready Built Distributors, Inc., have joined the case to assert any interest they may have in this litigation. The issue of the proper construction of the asserted claims is now before the Court.

## II. STATEMENT OF THE CASE[1]

The United States Postal Service (USPS) began purchasing a fleet of Grumman Long Life Vehicles (LLVs) during the 1980s. Def.'s Answer, ¶ 4. The Grumman LLV is a right-hand drive vehicle, meaning that the driver's seat is on the right side of the vehicle. Id. The USPS has experienced failures of the original TH180C transmissions used in the Grumman LLV postal vehicle. See id., ¶ 5; DA10, col. 3, lines 5-6. The original transmission has the shift lever located on the right side of the transmission. Id., col. 3, line 5.

The LLV is based on a Chevrolet S-10 pickup chassis. DA10, col. 3, line 20. The General Motors 700R4 transmission is designed for use on the same Chevrolet S-10 chassis. Id., col. 3, lines 16-21. The 700R4 transmission was selected by the USPS as an acceptable replacement for the 180C transmission. Cf. DA9, col. 1, lines 51-56. Because the shift lever on the 700R4 transmission is located on the left side of the transmission, the shift inputs from the driver would have to be transmitted to the other side of the vehicle.

---

[1] Defendant does not necessarily agree with plaintiff's factual assertions which are made without citation to any record evidence, see Pl.'s Cl. Const. Br. at 2-4. Plaintiff's assertions are not established facts.

In 1998, Jennings filed a patent application pertaining to a transmission linkage configuration, which the applicants called a "change-over linkage." See DA1. Before the filing of Jennings' patent application, linkage systems for connecting and transmitting shift information from one side of a vehicle to the other were known in the art. These configurations ranged in complexity from the simple cable type configuration, e.g., DA71, Fig. 2 (Shinki patent) to elaborate rigid linkage configurations, e.g., DA63, Fig. 2 (Tanaka patent).

Jennings' application issued as U.S. Patent No. 6,085,609 on July 11, 2000. DA1. The '609 patent discloses a specific linkage configuration which utilizes, inter alia, a rod that crosses the transmission with a single link near one end and a three-link assembly near the other end. See, e.g, DA6, Figure 3; DA10, col. 3, line 28 through col. 4, line 5.

## III. ARGUMENT

### A. The Law of Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted). Claim construction begins with the language of the claims themselves. See id. "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" Id. (citations omitted). "[T]he ordinary and

customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1313 (citations omitted).

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' … Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" Id. at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

"[C]laims 'must be read in view of the specification, of which they are a part.' … [T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (citations omitted). The Court

should consult the prosecution history,[2] if in evidence, in performing its claim construction analysis. Id. at 1317.

The Court may also consider extrinsic evidence, which is that evidence outside of the claims, specification and prosecution history. Id. However, the Federal Circuit has "explained that [the extrinsic evidence] is less significant than the intrinsic record in determining the legally operative meaning of claim language." Id. (citations and internal quotations omitted).

The claims are also limited by the inventors' disclosure in the specification. "The patent system is based on the proposition that claims cover only the invented subject matter." Phillips at 1321. "[T]he role of the specification is to describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification." On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1340 (Fed. Cir. 2006) (citing Phillips v. AWH Corp., 415 F.3d at 1321), cert. denied, 127 S.Ct. 683 (2006)); see also Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003) ("The purpose of the written description requirement [of 35 U.S.C. 112 ¶ 1] is to prevent an

[2] Plaintiff identifies the "'609 Prosecution History" as one of its exhibits. Pl.'s Cl. Const. Br. at v. However, plaintiff's exhibit is not the complete prosecution history. Plaintiff's exhibit omits, at least, the prior art contained in the history as well as certain pages at the end of the history.

applicant from later asserting that he invented that which he did not[.]"). Thus, fairness to all parties dictates that the claims be construed to cover that which the applicants disclose as their invention, but not beyond.

A claim limitation may be written in a "means-plus-function" format. See 35 U.S.C. § 112, ¶ 6. A means-plus-function limitation claims a means for performing a specified function without reciting the structure that performs that function. Id. "Section 112, ¶ 6, as is well-documented, was intended to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus. …The price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof." O.I. Corp. v. Tekmar Co., Inc., 115 F.3d 1576, 1583 (Fed. Cir. 1997) (citation omitted); see also 35 U.S.C. § 112, ¶ 6 ("such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.").

The construction of a means-plus-function limitation is a two step process. See JVW Enterprises, Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005). "First, we determine the claimed function. … Second, we identify the corresponding structure in the written description that performs that function." Id. (citation omitted). Corresponding structure is that

structure which "the specification or prosecution history clearly links or associates [with] the function recited in the claim." B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424 (Fed. Cir. 1997).

### B. The Government's Proposed Construction of the Claim Terms and Phrases

The asserted claims of the '609 patent are claims 1, 5, 7,11 and 12. Claims 1, 5, 7 and 11 are independent claims. Claim 12 is a dependant claim which refers to claim 11, and, therefore, is construed to incorporate all of the limitations of claim 11. 35 U.S.C. § 112, ¶ 4.

#### 1. "change-over linkage" of asserted claims 1, 5, 7, 11 & 12; "right-to-left change-over linkage" of claim 11; and "the change-over linkage" of claim 12

The Government's Proposed Construction: The claimed "change-over linkage" is limited to that disclosed in the specification of the '609 patent. Specifically, the claimed "change-over linkage" is the item identified as number 70 in the figures of the patent. Figure 3 of the patent is shown below. DA6.




Discussion:

Because the ‘609 patent specification consistently and repeatedly refers to a single “change-over linkage” with a very specific configuration and operation, the claimed “change-over linkage” is properly limited to that disclosed in the specification of the ‘609 patent, namely item 70. Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

“[T]he claims cannot be of broader scope than the invention that is set forth in the specification.” On Demand Mach. Corp., 442 F.3d at 1340. Where, as here, the specification identifies a particular configuration as “the invention” rather than merely a preferred embodiment, the claims are properly limited to the disclosed configuration. Honeywell Int’l, Inc. v. ITT Industs., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006). The written description of the ‘609 patent explicitly identifies the configuration depicted in Figures 2 through 4 as

"the change-over linkage of the invention." DA9, col. 2, lines 27-32 ("FIG. 2 is a view … showing the change-over linkage of the invention…."); id., col. 2, lines 33-42 (describing other figures as showing "the changeover linkage."). Furthermore, the specification identifies item 70 as "the change-over linkage" or simply "change-over linkage" rather than as an exemplary or preferred embodiment of the invention. See DA10, col. 3, lines 28-30 ("These components are operatively connected by the change-over linkage 70 that will now be described with primary reference to FIGS. 2A-1, 2A, 3 and 4."); id., col. 4, line 24 (the kit includes item "h. change-over linkage 70"); id., col. 5, lines 9-10 ("Install change-over linkage 70 as described above and adjust the three-part linkage.").

Plaintiff argues that the claimed "change-over linkage" should be broadly construed as any "mechanism for transmitting motion from the right side gear selection mechanism to the left side shift lever of the replacement transmission." Pl.'s Cl. Const. Br. at 9. In this litigation, plaintiff is asserting that the installation of cable-type configurations which do not utilize an elongate member infringe the method claim 11.[3] However, the patent does

[3] Although the Court should not construe the claims in light of accused devices, it is appropriate for the Court to be aware of the accused devices and methods to place the disputed claim terms in context and in order to arrive at a meaningful construction that can later be applied in the infringement (continued...)

not disclose any embodiments other than a rod with the single link near one end and a three-link assembly near the other. There is no disclosure of a configuration that uses a cable rather than the rod and linkage configuration described in the specification. On the contrary, the specification refers to the use of cables but not as an alternative to the rod (elongate member) of the claimed change-over linkage. See DA11, col. 5, lines 22-25 ("TV cable" (using universal cable 162) connecting the accelerator to the throttle of the fuel injector intake); id., col. 5, line 17 (the speedometer cable).

Plaintiff also argues that the prosecution history "is not particularly instructive" and asserts that the "Patent Office did not construe the 'change-over' linkage term." Pl.'s Cl. Const. Br. at 12. However, the prosecution history does indicate the patent examiner's understanding of the scope of the claimed invention, including the change-over linkage. The examiner was presented with an application disclosing a very particular change-over linkage which, as discussed above, the applicants described as the change-over

[3] (...continued)
analysis. See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1326 -1327 (Fed. Cir. 2006) ("While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction."); id. at 1331-32.

linkage of the invention. See DA13 - DA42 (patent application). There is no indication that the examiner understood the invention to be as broad as plaintiff now asserts. The examiner's "statement of reasons for the indication of allowable subject matter" suggests that he had a narrow view of the claimed invention:

> None of the prior art shows or renders obvious the combination, cooperation, and interaction of applicants' recited replacement transmission 40 with shift lever 128 (Fig. 2A); elongate member 110 spanning underneath said replacement transmission 40; means 120 proximate the first end of the elongate member 110 connected to the vehicles gear selection mechanism 12; means 130, 134, 138 proximate the second end of said elongate member 110 connected to said shift lever 128 (Fig. 2A) thereby converting rotational movement of said elongate member 110 to movement operating the shift lever 128 of said replacement transmission 40.

DA45, ¶ 6. Additionally, the examiner identified but did not rely upon the prior art Irimajiri patent. Id., ¶ 7; see also DA48 - DA51 (Irimajiri). The examiner described Irimajiri as "show[ing] a right hand shifter 42 with spanning means 43 to shift a transmission with a left side shift lever 38a (Fig. 3)." Id. Figures 1 and 3 from the Irimajiri reference are shown below.




DA49. As the examiner noted, Irimajiri discloses a mechanism for transmitting motion from the right side gear selection lever to the left side of the transmission. Therefore, if the examiner had understood the applicants to be claiming an invention as broadly as plaintiff now asserts, the examiner surely would have found the Irimajiri reference to be highly relevant and would have relied upon it.

Furthermore, asserted independent claims 1, 5 and 7 all explicitly limit the scope of the claimed "change-over linkage" to less than that proposed by plaintiff. Some of these limitations, such as the means-plus-function limitations, are addressed below.

Claim 11 is a method claim which includes the step of "installing a right-to-left change-over linkage." DA12, col. 8, line 11. As that claimed linkage cannot be of broader scope than the disclosed invention, the "right-to-left

change-over linkage must also be limited to the configuration identified as number 70 in the figures and described in the specification, see DA10, col. 3, line 28 through col. 4, line 5.

The Court should reject plaintiff's litigation-induced argument that the claimed change-over linkage broadly covers any configuration that transmits motion from the right side of a vehicle to the left side of the replacement transmission. There is no indication that the inventors conceived of any configuration other than that disclosed in the patent specification and illustrated in Figure 2. Therefore, plaintiff should not now be allowed coverage of configurations which it did not invent or claim.

Properly construed the "change-over linkage" of the claims 1, 5 and 7, and the "right-to-left change-over linkage" of claim 11 is limited to that disclosed in the specification of the '609 patent. Specifically, the claimed "change-over linkage" is the item identified as number 70 in the figures of the patent. This term does not cover a cable-type configuration.

As a dependant claim, claim 12 incorporates all of the limitations of independent claim 11. 35 U.S.C. § 112, ¶ 4. Therefore, for the reasons set forth above, this claim is also limited to "the change-over linkage" that is disclosed in the specification of the '609 patent.

**2. "gear selection mechanism" of claims 1, 5, 7, 11 & 12**

The Government's Proposed Construction: The "gear selection mechanism" means the gear selector lever, the shift rod and any intermediate components such as a shifting tube. These items are identified in the specification as numbers 12, 18 and 16, respectively. The "gear selection mechanism" is a part of the vehicle that is not removed when the original transmission is replaced, and the "gear selection mechanism" is not a component of the "change-over linkage."

Discussion:

The written description does not explicitly identify any "gear selection mechanism." However, one may discern that identity from a careful review of the claims, the written description and the figures.

The gear selector lever is identified as item 12 in the figures and is "mounted in customary fashion on the steering column 14." DA9, col. 2, line 66 through DA10, col. 3, line 1; see Fig. 2A. This gear selector lever 12 "connects to a conventional shifting tube 16 that runs the length of the steering column." DA10, col. 3, lines 1-3. "Shifting tube 16, in turn, connects to a manual shift rod," DA10, col. 3, lines 3-4, which is identified as number

18, id., col. 3, line 27. See Figs. 1, 1A, 2, 2A-1 and 2A.[4] These components form the claimed "gear selection mechanism."

As indicated in claim 1, the change-over linkage connects to the "gear selection mechanism" and "serv[es] to transfer gear selection information emanating from the driver's gear selector lever." DA11, col. 5, lines 37-38, 45-46. Therefore, the "gear selector mechanism" includes the driver's gear selector lever 12.

In a vehicle with the original transmission, the transmission shift lever connects to the shift rod 18. DA9, col. 2, lines 20-24. The claimed change-over linkage in the modified vehicle serves as a substitute for this connection. Id., col. 2, lines 30-33. Therefore, as the claimed change-over linkage connects to the "gear selection mechanism," the shift rod must be the last component in the series of links that constitute that "gear selection mechanism."

The claims indicate that the "gear selection mechanism" is part of the vehicle rather than the replacement transmission and change-over linkage. See, e.g., DA11, col. 5, line 46 ("gear selection mechanism of the vehicle");

---

[4] Figure 2A incorrectly identifies the shift rod as number 12. See DA5. Item 12 is the driver's gear selector lever mounted on the steering column, and, therefore, could not be located under the vehicle as indicated in figure 2A. DA9, col. 2, line 66 through DA10, col. 3, line 1; see also figures 1, 2 and 2A (identifying that same part as number 18).

id., col. 6, lines 47-49 ("a right hand drive vehicle that has a right side gear selection mechanism"); DA12, col. 8, lines 1-3 (the step of "removing the original transmission and original drive shaft from a right hand drive vehicle having a right side gear selection mechanism"). Likewise, Figures 1, 1A and 2 show the above-identified components of the "gear selection mechanism" on both the originally configured vehicle[5] and on the vehicle after the transmission replacement. Thus, properly construed, the "gear selection mechanism" is a part of the vehicle that is not removed from the vehicle when the original transmission is replaced.

Plaintiff's proposed construction is unduly ambiguous because it defines the mechanism in terms of where it begins (the gear selector lever) but not where the mechanism ends. A person of ordinary skill in the art of transmission linkages would not be able to discern from plaintiff's proposed construction where the "gear selection mechanism" ends in a series of links and levers and where the claimed "change-over linkage" begins. As the Supreme Court has stated:

> The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is

[5] Defendant's Exhibit I at DA92 and DA93 provides further details of transmission linkage in what the specification figures 1 and 1A identify as the prior art LLV postal vehicle.

> foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field.

United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236 (1942); see also 35 U.S.C. § 112 ¶ 2.

Furthermore, because the claimed "change-over linkage" includes parts which are, at least indirectly, actuated by the driver and which operate to select a gear, it appears to satisfy plaintiff's definition of a "gear selection mechanism." However, as discussed above, the two items are described in the patent as separate components.

The Court should reject plaintiff's proposed construction and construe the phrase "gear selection mechanism" as requested by the Government. The Government's construction is consistent with the patent's specification and will allow a meaningful application to the non-infringement and invalidity analyses.

**3. "shift lever of the replacement transmission" of asserted claims 1, 5, 7, 11 & 12**

The Government's Proposed Construction: This phrase refers to the lever or arm attached to the gear selector shaft. The gear selector shaft penetrates the left side of the replacement transmission housing, and the "shift lever" is external to the transmission housing. The "shift lever" is not a

component of the "change-over linkage." This item is identified in the specification as number 128.

Discussion:

"[T]he shift lever 128 of replacement transmission 40 is disposed on the left side of the transmission[.]" DA10, col. 3, lines 25-26. The claimed "change-over linkage" connects to the "shift lever of the replacement transmission." See, e.g., DA11, col. 6, lines 14-17. Figure 2A shows that this lever is attached to a shaft that penetrates the side of the transmission. Similarly, the shift lever 22 of the original transmission is depicted as a lever attached to a shaft that penetrates the side of the transmission. DA10, col. 3, lines 4-5; DA3, Fig. 1A; see also DA2, Fig. 1.

The Government's construction of the "shift lever" as the lever or arm attached to the shaft that penetrates the housing is consistent with the examiner's apparent understanding of the term. See DA45, ¶ 7. The examiner discussed the Irimajiri reference and identified Irimajiri's "left side shift lever 38a."[6] Id. Irimajiri refers to "a gear shift spindle 38 [which] projects from the lefthand side of the transmission case." DA50, col. 2, lines 4-5.

[6] "Prior art cited in the prosecution history falls within the category of intrinsic evidence. Prior art the examiner failed to consider is extrinsic." Tate Access Floors, Inc. v. Interface Architectural Resources, Inc., 279 F.3d 1357, 1372 (Fed. Cir. 2002).

(G000201); see also DA49, Fig. 2. Attached to spindle 38 is crank member 38a, DA50, col. 2, lines 33-35; DA49, Fig. 3, which the examiner identified as a "left side shift lever," DA45, ¶ 7.

The specification refers to "the shift lever on the replacement transmission," DA9, col. 1, lines 15 (emphasis added), not inside the transmission. See also DA1, Abstract ("the shift lever on the left side of the replacement transmission"); DA9, col. 1, line 15; id., col. 2, line 33; DA12, col. 8, line 13. Therefore, the shift lever is located external to the transmission housing.

Extrinsic evidence also demonstrates that the Government's proposed construction is consistent with usage of the term in the art. See DA59, col. 2, lines 49-51 (Venuto patent describing a linkage 10 (which is a lever) connected to the "gear shift valve trunnion 38 of the transmission 34."); DA68, col. 3, lines 7-8 and DA63, Fig. 2 (Tanaka patent, "shift lever 35"); DA86, col. 5, line 36 and DA77, Fig. 8 (Shinki patent, "input lever 62"). The maintenance manual for the postal vehicle identifies as the "control lever" the same item identified in the '609 patent as the shift lever 22 of the original transmission. Compare DA93, Fig. 33 (item 8) with DA2, Fig. 1 (item 22).

The language of the claim term itself indicate that the "shift lever of the replacement transmission" is part of the replacement transmission rather than

the change-over linkage. The claims also distinguish these two components. See DA11, col. 5, lines 37-40 (change-over linkage transfers information to the shift lever); id., col. 6, lines 14-17 (change-over linkage connects to the shift lever); id., col. 6, lines 52, 57 (listing the change-over linkage and the replacement transmission with the shift lever as two separate components of the kit); DA12, col. 8, lines 5-6, 11-14; id., col. 8, lines 19-26. Thus, properly construed, "shift lever of the replacement transmission" is part of the replacement transmission rather than the change-over linkage.

Plaintiff's proposed construction is unduly ambiguous particularly by the use of the vague phrase "associated with the replacement transmission." The Court should adopt the Government's construction which is both consistent with the patent's specification and will allow a meaningful application to the accused devices.

**4. "said elongate member having first and second ends that are rotatably supported" of claim 1, and "an elongate member supported for rotational movement at its right and left ends" of claims 5 and 7**

The Government's Proposed Construction: Each of these limitations require that the support be located at the end (i.e., the terminus or extreme part lengthwise) of the elongate member. The "means proximate the first end of said elongate member" and "means proximate the second end of said

elongate member" of claim 1 must be near the ends, but cannot be at the ends, where the elongate member is "rotatably supported." Similarly, the "means proximate the right end of said elongate member" and "a multicomponent assembly proximate the left end of said elongate member" of claims 5 and 7 must be near the ends, but cannot be located between the support and the respective end of the member where it is rotatably supported.

Discussion:

The parties appear to be in agreement as to the general location of the supports. The claim language requires the supports to be at the "ends" of the elongate member. DA11, col. 5, lines 43-44; id., col. 6, lines 22-24; id., col. 6, lines 60-62. Plaintiff refers to the "end" as the "end portion." Pl.'s Cl. Const. Br. at 19. The Government refers to the "end" as the terminus or extreme part lengthwise, JCCS at 11, 17.[7] See also DA96 (MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1997) ("end" defined as "the extreme or last part lengthwise")). Plaintiff contends that the support location is in the region of the end, as opposed to the extreme end. Pl.'s Cl. Const.

---

[7] Plaintiff erroneously asserts that the Government's proposed construction requires the support to be at the "extreme or terminal ends." Pl.'s Cl. Const. Br. at 18. The Government defined "end" as the "terminus or extreme part lengthwise," which is preferable to plaintiff's attempt to define "end" in terms of the "end." See Pl.'s Cl. Const. Br. at 19 ("'ends' refers to an end portion").

Br. at 19. The Government does not disagree, and the Government's proposed construction, referring to the "extreme part lengthwise," is consistent with that notion. Contrary to plaintiff's assertions, the Government's construction is not inconsistent with the specification. For example, Figure 2A shows the support at the extreme part lengthwise of the elongate member. DA5.

More important to the proper construction is the location of the supports relative to the other components of the change-over linkage. The language of claim 1 distinguishes the position of the components relative to the elongate member. DA11, col. 5, lines 42-45, 50. For example, the "means proximate the first end of said elongate member" and "means proximate the second end of said elongate member" must be near the ends, but cannot be at the "first and second ends," where the elongate member is "rotatably supported." Id. (emphasis added). Thus, in claim 1, the first and second linkage connection means must be towards the center of the elongate member relative to the member's supports.

Likewise, the language of claims 5 and 7 distinguishes the relative position of the components on the elongate member. DA11, col. 6, lines 22-25, 30-31, 60-63; DA12, col. 7, lines 1-2. The "means proximate the right end of said elongate member" and "a multicomponent assembly proximate the left

end of said elongate member" must be near the "right and left ends," but must be nearer the center of the elongate member than the supports for the elongate member. Id.

Figures 2A-1, 2A, 3, 4 and 5 and the written description of the claimed change-over linkage further supports the Government's proposed construction. See DA4 through DA8; DA10, col. 3, lines 39-50, lines 56-57. There is no disclosure of any supports inboard of the "means" or multicomponent assembly.

The Government's proposed construction avoids the ambiguity resulting from plaintiff's construction which defines "end" circularly by using that same word in the definition. See Pl.'s Cl. Const. Br. at 19 ("'ends' refers to an end portion"). Therefore, and because plaintiff does not dispute the Government's position concerning the relative locations of components on the elongate member, the Court should adopt the Government's construction for these phrases.

**5. "means proximate the first end of said elongate member connecting the gear selection mechanism of the vehicle to said elongate member for imparting rotational movement to the member in response to the driver's selection of gear" of claim 1**

The parties agree that this clause is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6. JCCS at 2. The parties also agree that the

claimed function is "imparting rotational movement to the member in response to the driver's selection of gear." Id.

The Government's Proposed Construction: The structure corresponding to the claimed function is the first link 120 that is fixedly secured to rod 110 and that includes an opening 124 that connects directly to shift rod 18. This limitation requires a single link which is directly connected to the "gear selection mechanism" (discussed above) at the shift rod 18 and to the elongate member (rod 110).

Discussion:

Because this clause is a means-plus-function limitation, the Court must look to the specification to determine the structure corresponding to the claimed function. JVW Enterprises, Inc., 424 F.3d at 1330. The specification describes the corresponding structure as follows:

> At the first end of rod **110**, adjacent to plate **74** and L-member **100**, is a first link **120** that is fixedly secured to rod **110**. Link **120** includes an opening **124** that connects directly to shift rod **18** so that the driver's changing of gears through the gear selector lever in the driver's compartment may be mechanically transmitted to rod **110** as rotational movement of the rod.

DA10, col. 3, lines 49-55. This described corresponding structure is depicted in figures of the patent, including Figure 2A-1 and the portion of Figure 3 shown below.




Fig. 2A-1




Fig. 3 (partial)

The corresponding structure is that structure which "the specification or prosecution history clearly links or associates [with] the function recited in the claim." B. Braun Med., Inc., 124 F.3d at 1424. The parties agree that the corresponding structure includes link 120. See Pl.'s Cl. Constr. Br. at 22. The parties disagree as to whether other structure described in the specification is corresponding structure.

Properly construed, the corresponding structure for performing the claimed function is: The first link 120 that is fixedly secured to rod 110 and that includes an opening 124 that connects directly to shift rod 18. DA10, col. 3, lines 49-52; see also Figures 2 through 5. Therefore, this limitation requires a single link which is directly connected to the "gear selection mechanism" at the shift rod 18 and to the elongate member (rod 110).

Plaintiff, citing Asyst Techs. Inc. v. Empak, Inc., 268 F.3d 1364, 1370 (Fed. Cir. 2001), argues that opening 124 in link 120 performs a function other than the claimed "imparting rotational movement" function. Pl.'s Cl. Const. Br. at 23. However, this is contrary to the key language of the specification: "Link 120 includes an opening 124 that connects directly to shift rod 18 so that the driver's changing of gears through the gear selector lever in the driver's compartment may be mechanically transmitted to rod 110 as rotational movement of the rod." DA10, col. 3, lines 51-55. This language clearly associates the "opening 124 that connects directly to shift rod 18" with the claimed "imparting rotational movement" function.

Plaintiff's reliance on Asyst is misplaced. In Asyst, the structure at issue (communications line 51) did not perform the claimed function. Asyst, 268 F.3d at 1371. In contrast, opening 124 of the '609 patent "is integral to performing the claimed function," and, therefore, is properly construed as corresponding structure. Gemstar-TV Guide Int'l, Inc. v. International Trade Comm'n, 383 F.3d 1352, 1363 (Fed. Cir. 2004).

Furthermore, neither the specification nor plaintiff suggests how link 120 without "opening 124 that connects directly to shift rod 18" could impart rotational movement to the elongate member 110 in response to the driver's selection of a gear. For example, Figures 2 and 2A-1, DA4, depict shift rod

18 as directly connected to link 120 via opening 124. Without the opening directly connected to the shift rod, movement of the shift rod in response to the driver's selection of a gear would not be transmitted to link 120 and would not impart rotational movement of the elongate member.

Therefore, as properly construed, the corresponding structure for performing the claimed function is the first link 120 that is fixedly secured to rod 110 and that includes an opening 124 that connects directly to shift rod 18.

**6. "means proximate the right end of said elongate member for connecting the gear selection mechanism of the vehicle to the elongate member for imparting rotational movement to the elongate member in response to the driver's selection of gear" of claims 5 and 7**

The parties agree that this clause is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6. JCCS at 2. The parties also agree that the claimed function is "connecting the gear selection mechanism of the vehicle to the elongate member for imparting rotational movement to the elongate member in response to the driver's selection of gear." See Pl.'s Cl. Const. Br. at 24.[8] Plaintiff states that the claimed function is "essentially the same as the preceding [means-plus-function] element," i.e. the means proximate the first

[8] Plaintiff's recitation of the claimed function incorrectly adds a "d" to the end of the term "elongate." The pertinent claim limitations refer to an elongate, not elongated, member. DA11, col. 6, lines 25, 27, 28, 63, 65, 67.

end, of claim 1. Pl.'s Cl. Const. Br. at 24-25. However, plaintiff fails to acknowledge that the claimed function of this disputed clause of claims 5 and 7 does include "connecting." Plaintiff's arguments concerning the preceding means-plus-function limitation of claim 1 were based on the claimed function not reciting "connecting." See id. at 23-24.

The Government's Proposed Construction: The structure corresponding to the claimed function is the first link 120 that is fixedly secured to rod 110 and that includes an opening 124 that connects directly to shift rod 18. This limitation requires a single link which is directly connected to the "gear selection mechanism" (discussed above) at the shift rod 18 and to the elongate member (rod 110).

Discussion:

Having determined the claimed function, the Court next must then "identify the corresponding structure in the written description that performs that function." JVW Enterprises, Inc., 424 F.3d at 1330. The corresponding structure is that structure which "the specification or prosecution history clearly links or associates [with] the function recited in the claim." B. Braun Med., Inc., 124 F.3d at 1424.

Like the "means proximate the first end" clause discussed with relation to claim 1, the specification describes the corresponding structure as follows:

> At the first end of rod **110**, adjacent to plate **74** and L-member **100**, is a first link **120** that is fixedly secured to rod **110**. Link **120** includes an opening **124** that connects directly to shift rod **18** so that the driver's changing of gears through the gear selector lever in the driver's compartment may be mechanically transmitted to rod **110** as rotational movement of the rod.

DA10, col. 3, lines 49-55.

The structure which the specification clearly associates with the claimed "connecting" function is the first link 120 that is fixedly secured to rod 110 and that includes an opening 124 that connects directly to shift rod 18. Plaintiff agrees that "[o]pening 124 formed in link 120 connects to the gear selection mechanism[.]" Pl.'s Cl. Const. Br. at 23. Therefore, this limitation requires a single link which is directly connected to the "gear selection mechanism" at the shift rod 18 and to the elongate member (rod 110).

**7. "means proximate the second end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongate member to movement operating the shift lever of the replacement transmission" of claim 1**

The parties agree that this clause is a means-plus-function limitation governed by 35 U.S.C. § 112 ¶ 6. JCCS at 2. The parties also agree that the claimed function is "connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the

elongate member to movement operating the shift lever of the replacement transmission."[9] JCCS at 2-3.

The Government's Proposed Construction: The structure corresponding to the claimed function is: links 130, 134 and 138, and bolts 145 and 147, an opening 140 in link 138 which connects directly to the shift lever 128, and slot 149 in link 134.

Discussion:

The patent specification provides the identity of the structure corresponding to the claimed function. JVW Enterprises, Inc., 424 F.3d at 1330. The specification clearly demonstrates that the "multicomponent assembly" performs the claimed "connecting" function. DA10, col. 3, lines 56-60 ("A multicomponent assembly is mounted proximate the opposite end of rod 110 for connecting rod 110 to shift lever 128 of replacement transmission 40 in such a way that rotational movement of rod 110 serves to operate the shift lever."). This corresponding structure is that shown in Figures 2A-1, 2A, 3 and 4 (see id., col. 3, lines 28-30) and described as follows:

> This assembly comprises a first component **130** that is fixedly secured to rod **110** by welding or the like, and respective pivotally

---

[9] Plaintiff's recitation of the claimed function, Pl.'s Cl. Const. Br. at 25, incorrectly adds a "d" to the end of the term "elongate." The pertinent claim limitations refer to an elongate, not elongated, member. DA11, col. 5, lines 50, 51, 53.

> connected links **134** and **138**. Opening **140** in link **138** connects directly to shift lever **128**. This three-part assembly may be adjusted in configuration by loosening and thereafter tightening the illustrated bolts **145**, **147** so that it precisely affixes to shift lever **128** for a proper changing of gears in response to the driver's movement of the gear selector lever **12**. More particularly, the spatial adjustment of the assembly is achieved by locating bolt **145** at the desired location in slot **149** in intermediate link **134** and by pivoting links **134, 138** as necessary about the pivot points defined at bolts **145**, **147**.

id., col. 3, line 56 through col. 4, line 5. Therefore, the corresponding structure includes links 130, 134 and 138, and bolts 145 and 147. The structure also includes an opening 140 in link 138 which connects directly to the shift lever 128, and the slot 149 in link 134.

The prosecution history indicates that the examiner understood the claimed means as requiring more than just the link 130 as plaintiff proposes. The examiner specifically referenced the three linking structures "130, 134, 138 proximate the second end of said elongate member 110" in the "statement of reasons for the indication of allowable subject matter." DA45, ¶ 6.

As discussed above, plaintiff's reliance on Asyst is misplaced. In Asyst, the structure at issue (communications line 51) did not perform the claimed function. Asyst, 268 F.3d at 1371. However, in this case, the structure identified above as the multicomponent assembly "is integral to performing the

claimed function," and, therefore, is properly construed as corresponding structure. Gemstar, 383 F.3d at 1363.

For these reasons, the Court should adopt the Government's construction of the corresponding structure in this means-plus-function limitation.

**8. "at least one additional link pivotally connected to the first component" of claims 5 and 7**

The dispute over this term is between plaintiff and third-party defendant Jasper Engines. See Pl.'s Cl. Const. Br. at 27.

The Government's Proposed Construction: The language of claims 5 and 7 requires that the "at least one additional link" be connected to and pivot relative to the "first component." DA11, col. 6, lines 34-36; DA12, col. 7, line 6-7.

Discussion:

This claim language does not address the movement of the "additional link" relative to the "elongate member." See id.; see also DA4 through DA7 (Figures 2, 2A-1, 2A, 3 and 4); DA10, col. 3, line 56 through col. 4, line 5.

**9. "kit" of claim 7**

The Government's Proposed Construction: "Kit" means a packaged set of parts, and does not encompass a completed assembly of the parts

included in the "kit." The listed components of the kit must be supplied together and not purchased separately.

Discussion:

The term "kit" means a packaged set of parts. See Norian Corp. v. Strykker Corp., 363 F.3d 1321, 1335 (Fed. Cir. 2004) (Schall, J., concurring–part, dissenting-in-part) ("a kit is generally understood to be a packaged set or collection of related items"). Where parts are supplied separately, they are not a packaged set, and, therefore, the parts do not constitute a "kit." Thus, claim 7 requires that the listed components of the kit be supplied together and not purchased separately.

Contrary to plaintiff's position, the term "kit" serves as a limitation on the scope of claim 7 notwithstanding that the term appears in the preamble of the claim. The preamble limits the scope of the claim when "it states a necessary and defining aspect of the invention." On Demand Mach. Corp., 442 F.3d at 1343. The preamble is a limitation because "it states the framework of the invention" and because "the entirety of the claim implements the preamble's" kit for replacing a transmission. Id. at 1343-44.

Additionally, plaintiff erroneously argues that "[t]he patentability of claim 7 did not depend on the inventor using the word 'kit.'" Pl.'s Cl. Const. Br. at 31. A patent may only be obtained for certain categories of subject matter.

35 U.S.C. § 101. A "kit" falls within one of those categories of patentable subject matter. In re Venezia, 530 F.2d 956, 960 (C.C.P.A. 1976) (holding that "a group or 'kit' of interrelated parts" is patentable subject matter as a "manufacture" within the meaning of section 101). Therefore, the applicants' use of the term "kit" serves to identify the category of patentable subject matter as required by section 101.

Furthermore, the Government's proposed construction is consistent claim language and with the specification's description. The claims must be read in light of the specification, which "is the single best guide to the meaning of a disputed term." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); Phillips, 415 F.3d at 1315. Claim 7 claims a kit and lists the parts included in that kit. DA11, col. 6, line 47 through DA12, col. 7, line 10. Dependant claims 8 and 9 further limit the claimed "kit" by listing additional items that must be included in the kit. DA12, col. 7, lines 11-16. These kit claims are distinguished from claims1 through 6, which claim assembled components. See DA11, col. 5, line 33 through col. 6, line 46.

The specification uses "kit" consistent with the understanding that a kit is a packaged set of parts, rather than a completed assembly. DA9, col. 2, lines 6-9 ("In yet another aspect, the present invention may be defined as a kit including parts necessary to make a transmission replacement as

described above."); DA10, col. 4, lines 8-12 ("the present invention may be made available to the marketplace in the form of a kit containing necessary parts to replace the original equipment transmission of a right hand drive vehicle with a replacement transmission of different design"). Figure 5 of the patent "illustrates the primary components of a kit containing necessary parts for replacing the original equipment transmission of a right hand drive vehicle with a replacement transmission primarily adapted for a left hand drive vehicle." DA9, col. 2, lines 43-47; see also DA10, col. 4, line 13.

Plaintiff's construction is incorrect to the extent that it contends that claim 7 covers an assembly of parts. Pl.'s Cl. Const. Br. at 29 (suggesting that the "[i]ndividual parts of the kit may comprise an assembly."). Although the claimed kit is comprised of parts capable of assembly, that completed assembly is not a "kit." See, e.g., DA9, col. 2, lines 1-8 (distinguishing the change-over linkage invention with the kit invention). Plaintiff's reliance on figure 2A, which shows an assembly, is misplaced. The specification identifies figure 5, not figure 2A, as "illustrat[ing] the primary components of a kit[.]" DA9, col. 2, line 43. The prosecution history further supports the distinction between the kit and the assemblies of independent claims 1 and 5. DA52-DA53 (the applicants' attorney referring to the "transmission/linkage

combination (claim 1), the linkage per se (claim 5) … and the kit ([application] claim 9)”).

Lastly, the Government’s proposed construction is supported by the dictionary definitions of “kit.” DA97 (MERRIAM-WEBSTER’S COLLEGIATE DICTIONARY (10th ed. 1997) (“a set of parts to be assembled or worked up”; “a packaged collection of related material”).

**10. “connecting” of claims 1, 5, 7, 11 and 12**

The Government’s Proposed Construction: In the ‘609 patent, “connecting” means “directly connecting.”

Discussion:

The term “connecting” in the asserted claims appears primarily in the context of the means-plus-function clauses discussed above. The term also appears in the “multicomponent assembly” limitation of claims 5 and 7, and in the method claims 11 and 12.

Plaintiff contends that “connecting” may be either directly or indirectly. Pl.’s Cl. Const. Br. at 33. “However, as explained in Phillips, [plaintiff] is not entitled to a claim construction divorced from the context of the written description and prosecution history.” Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1144-45 (Fed. Cir. 2005). The claims cannot be construed to be broader than the invention disclosed in the written description. On Demand

Mach. Corp., 442 F.3d at 1340; see also Searfoss v. Pioneer Consol. Corp., 374 F.3d 1142, 1150 (Fed. Cir. 2004) (holding that "the district court was correct in interpreting 'connecting' as used in [the patent at issue in that case] to include only direct, rigid, pivotal connections," based, in part, on references to direct connections in the specification).

The specification only discloses direct connections between the single link of change-over linkage and the shift rod on the one side, and between the multicomponent assembly of the change-over linkage and the shift lever on the other side. See DA10, col. 3, lines 51-52, 56-63; see also Pl.'s Cl. Const. Br. at 34-35 (quoting these portions of the written description). Plaintiff does not point to any disclosure of an indirect connection between the change-over linkage and another component. It does not follow that a person of ordinary skill in art, upon reading the specification, would conclude that the patent applicants invented a linkage configuration involving indirect connections.

The Court should construe the claim term "connecting" as meaning "directly connecting."

**11. "said method comprising the steps of . . ." of claim 11 and "The method of claim 11" of claim 12**

The Government's Proposed Construction: Claims 11 and 12 require that the steps of "raising a replacement transmission with left side shift lever,

and associated torque convertor, into position" and "installing a right-to-left change-over linkage operatively connecting the right side gear selection mechanism of the vehicle to the left side shift lever on the replacement transmission" be performed in the specific sequence listed in claim 11. In particular, the replacement transmission must be raised into position in the vehicle prior to the installation of the "right-to-left change-over linkage."

Discussion:

Contrary to plaintiff's assertions, the Government is neither "urg[ing] the Court to rewrite the claims" nor "seek[ing] to import a sequence limitation." Pl.'s Cl. Const. Br. at 36, 37. Rather, the Government is merely asking the Court to construe the limitations in the process claims as written. The steps of a method claim may be properly construed as requiring a specific order "when the method steps implicitly require that they be performed in the order written." Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369 (Fed. Cir. 2003); see also Mantech Envtl. Corp. v. Hudson Envtl. Services, Inc., 152 F.3d 1368, 1376 (Fed. Cir. 1998) ("We hold, therefore, that the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise.").

The method of claim 11 comprises several steps, including the step of "raising a replacement transmission with left side shift lever, and associated

torque convertor, into position" and the step of "installing a right-to-left change-over linkage operatively connecting the right side gear selection mechanism of the vehicle to the left side shift lever on the replacement transmission." DA12, col. 8, lines 5-6, 11-14. The language of the latter step indicates that the installation of the "linkage operatively connecting" the vehicle to the transmission would not be possible until after the transmission has been raised into position in the vehicle. Therefore, the claim language requires that these two steps must be performed in the sequence as written. See Loral Fairchild Corp. v. Sony Corp., 181 F.3d 1313, 1321-22 (Fed. Cir. 1999) (limiting the method to the sequence indicated).

The specification supports this interpretation. Cf. Altiris, 318 F.3d at 1370 (quoting Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1343 (Fed. Cir. 2001) (the Court may also look to the specification to determine whether it requires a specific sequence). The specification describes the method as a "step-by-step procedure." DA10, col. 4, line 27; DA1 (the abstract). The step of raising the replacement transmission into position in the vehicle is identified as "the first step in installing the replacement transmission." Id., col. 4, lines 51-53 (step 13). Step 22 involves both the installation of the change-over linkage and adjusting the three-part linkages. DA11, col. 5, lines 9-10. The specification describes the elongate

member of the change-over linkage as being mounted to the vehicle chassis and crossing under the replacement transmission. DA10, col. 43-48. It is apparent from figure 2A that the change-over linkage could not be installed and the three-part linkages adjusted until after the replacement transmission had been installed into the vehicle.

Plaintiff suggests that the change-over linkage could be partially installed prior to the installation of the replacement transmission. Pl.'s Cl. Const. Br. at 37. However, no such additional step is described in the specification. See DA10, col. 4, lines 50-53. Furthermore, the "first step in installing the replacement transmission" is raising it into position, not partially installing the change-over linkage. Id.

As a dependant claim, claim 12 incorporates all of the limitations of independent claim 11, 35 U.S.C. § 112, ¶ 4. Therefore, both claims 11 and 12 require that the steps of installing the replacement transmission and installing the change-over linkage be performed in the sequence of claim 11.

## IV. CONCLUSION

For the reasons set forth above, the Court should construe the disputed claim terms and phrases as proposed by the Government.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

March 23, 2007

s/ Ken B. Barrett

KEN B. BARRETT
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 307-0343
Facsimile: (202) 307-0345
E-mail: ken.barrett@usdoj.gov

Attorneys for the United States

OF COUNSEL:
GARY L. HAUSKEN
Assistant Director
Department of Justice