# In the United States Court of Federal Claims

Case No. 05-1209C
(Filed: December 14, 2007)
NOT FOR PUBLICATION

**********************************************
JENNINGS TRANSMISSION *
SERVICE OF GOLDSBORO, INC., *
*Plaintiff*, *
v. *
*
THE UNITED STATES OF AMERICA, *
*Defendant,* *
and *
*
JASPER ENGINES & TRANSMISSION, *
*Third-Party Defendant*, *
and *
*
READY BUILT DISTRIBUTORS, INC., *
*Third-Party Defendant*. *
**********************************************

## OPINION/ORDER

## I. Background and Procedural Status:

Plaintiff, Jennings Transmission Service of Goldsboro, Inc. ("Jennings"), manufactures and distributes new and rebuilt vehicle transmissions. In addition, Jennings owns U.S. Patent No. 6,085,609 ("the 609 patent"), pertaining to a device used in the replacement of the right-hand transmission with a left-hand transmission in right-hand drive vehicles.

Jennings' invention was conceived from the company's experience in repairing Grumman Long Life Vehicle (LLV) transmissions for the United States Postal Service. The LLVs were right-hand drive vehicles which continued to experience a high rate of transmission failure even after repair. The Plaintiff eventually created a transmission replacement kit to retrofit the right-hand LLVs with left-hand transmissions that better withstood the start-and -stop conditions imposed upon the Postal Service vehicles during mail routes.

This case arose when the Postal Service allegedly began procuring similar devices from Third-party Defendants Jasper Engines & Transmissions ("Jasper") and Ready Built Distributors, Inc. (Ready Built), two companies which have no relationship aside from their involvement in this matter.

Discovery continues and the parties have yet to pursue dispositive motions as to the issues of liability or damages. However, they have asked the Court to construe several terms and phrases contained within the claims of the 609 patent before proceeding further. Accordingly, we held a *Markman* hearing on November 28, 2007, in order to facilitate the subsequent determination of liability by the parties. *Markman v. Westview Instr., Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

## II. **Claim Construction**:

As both parties concede, the 609 patent involves relatively straightforward technology, which was presented, via representations of counsel, during a very brief tutorial preceding the claim construction hearing. Plaintiff's counsel provided the tutorial. Counsel for the United States concurred generally with his colleague's remarks, with the proviso that any and all descriptions offered during the tutorial and the hearing that followed were not "factual matters," and should not be considered for purposes of any subsequent summary judgment proceeding or trial.

Rather than reproducing the claims in their entirety here, we shall discuss them, along with controlling precedent, in the context of the disputed terms and clauses.

### *A. Change-Over Linkage*

The parties first dispute the meaning of the term "change-over linkage," variously described in the 609 patent as "right-to-left change-over linkage" or "the change-over linkage" of the invention. In claims 1, 4, 5, 7 and 12, the term "change-over linkage" is used, while "right-to-left change-over linkage" is used in claim 11. The change-over linkage is a critical component of the invention. The Plaintiff would have us construe the term in the broadest fashion as:

> A mechanism or system for transmitting motion from the gear selection mechanism to the shift lever of a transmission for the purpose of changing the connection of the gear selection mechanism to the transmission from one side (the right side) to the other side (the left side.)

Collectively, the Defendants argue for a limited interpretation of the term. With one exception, which we will address, Jasper and Ready Built have adopted the Government's proposed constructions and arguments as their own. They ask the Court to rule that "change-over linkage" or "right-to-left change-over linkage" is:

> Limited to that disclosed in the specification of the '609 patent. Specifically, the item identified as number 70 in the figures of the patent (Fig. 3 at Defendant's Appendix ("Def. App.") 6).

Notably absent from the Defendant's proposed construction is an actual proposed construction. The United States would have us construe the term "change-over linkage" strictly, limiting it to devices that can be directly identified with the accompanying drawing, Fig. 3, which is reproduced as an appendix to this Order.

The written description of the 609 patent repeatedly refers to configuration depicted in the diagrams as "the change-over linkage of the invention," but the language within the patent also indicates that the drawings are merely potential embodiments of the invention. Notwithstanding the fact that Fig. 3 may be the sole embodiment of the changeover linkage, we do not find any language in the specification, or in the sparse prosecution history, requiring us to strictly limit the claims to the disclosed embodiment. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1373 (Fed. Cir. 2003); *but see, Honeywell Internatl., Inc., et al. v. ITT Indus., Inc., et al.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (Where component was not discussed as a mere preferred embodiment, but repeatedly identified as "the present invention," claim was limited to that component.)

We agree that the changeover linkage cannot be defined in the sweeping manner proposed by Jennings. However, interpreting the claim exclusively by reference to the accompanying drawings would violate the principals of claim construction set forth by the U.S. Court of Appeals for the Federal Circuit in the *en banc* decision of *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). Limitations from a specification may not be read into the claims, absent evidence that the patentee "intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* at 1323; *see also*, *ACTV, Inc. v. Walt Disney* Co., 346 F.3d 1082, 1091 (Fed. Cir. 2003); *Comark Communications, Inc. v. Harris Corp*., 156 F.3d 1182, 1186 (Fed. Cir. 1998); *SRI Int'l. V. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 n. 14 (Fed. Cir. 1985) (*en banc*).

We shall not depart from the general rule that the scope of a the claim is not limited to the preferred embodiments appearing in the description of the invention. *See Constant Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims.") (clarifying *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867 (Fed. Cir. 1985)); *Teleflex, Inc. v. Ficosa North American Corp*., 299 F.3d 1313, 1326 (Fed. Cir. 2002). This is especially so in cases such as the present matter, where the specification anticipates the possibility of deviations from the depictions. *See* 609 Patent, col. 5, ln. 29-32 ("While the invention has been described in connection with certain illustrated embodiments, it will be appreciated that modifications may be made without departing from the true spirit and scope of the invention"); *see also*, 609 Patent, col. 2, ln 52-62 ("description ... not limiting upon the present invention.")

The prosecution history reveals that the only changeover linkage mechanism referenced in the patent examiner's justification for approval of the 609 patent is an "elongate member 110 spanning underneath said replacement transmission 40." Def. App. at 45. The elongate member is also referred to consistently in the body of the claims. Thus the Government is correct in arguing that the rod depicted in Figure 3 is an integral part of the change-over linkage mechanism or system.

Consequently, we conclude that the term "change-over linkage" and "right-to-left change-over linkage," appearing in claims 1, 5, 7, 11 and 12, refers to:

> A mechanism for transmitting motion from the gearshift to the shift lever of the transmission, comprising an elongate member and means to translate motion on both ends of the member.

*B.* *<u>Gear Selection Mechanism</u>*

The term "gear selection mechanism" also recurs throughout the claims, appearing in claims 1, 5, 7, 11 and 12. The arguments concerning this term follow the same general pattern as in the previous item. The Government relies heavily on the descriptive embodiment, whereas the Plaintiff offers a vague definition for what appears to be a fairly noncontroversial apparatus. The "gear selection mechanism," under both the construction of each party, is part of the prior art, and not a component of the invention. Jennings proposes:

> Two or more movable parts in a vehicle that are actuated by the driver, and which are operative to select a gear.

In the context of the remainder of the claim language, it is readily apparent that the gear selection mechanism is that apparatus which the driver controls directly in order to shift the transmission or gears from park to either drive or reverse. It is a gear shift, like any gear shift which extends from the base of the steering column or the floor of an automatic transmission vehicle.

The Government proposes the following much more extensive and specific interpretation of this commonplace item:

> Specifically, an assembly beginning with the gear selector lever (gearshift), ending with the shift rod, and including any intermediate components such as a shifting tube. Importantly, none of these items are removed when the original transmission is replaced. These items are identified in the specification as numbers 12, 18 and 16, respectively.

The Government's construction is based on the drawings and "detailed description of the invention":

> Referring to the drawings, and particularly to FIG. 1, there is shown in phantom a right hand drive Grumman LLV-A postal vehicle ... This right hand drive vehicle has a driver's gear selector lever mounted in customary fashion on the steering column 14. Lever 12 connects to a conventional shifting tube 16 that runs the length of the steering column. Shifting tube 16, in turn, connects to a manual shift rod that runs to a mechanism 20 for shifting the manual shift lever 22 on the right side of the original equipment transmission 26 (typically a Grumman 180C transmission).

609 Patent at col.2, ln. 63 - col.3, ln. 6.

The very language cited by the Government indicates that it is illustrative at best. It relies upon drawings and descriptions of a gear selector mechanism for a Grumman vehicle, which is "typically," although not necessarily, the vehicle involved in the transmission replacement. The nature of this invention is not limited to a certain model vehicle or transmission, despite the fact that it has been historically employed by the Postal Service for its Grumman Long Life Vehicle fleet.

We limit the term "gear selection mechanism" in the following manner:

> Two or more movable parts in a vehicle, beginning with a gear selector lever and ending with a shift rod that subsequently connects to either a shift lever or a further means of transmitting the driver's motion to a shift lever.

*C.* *Shift Lever of the Replacement Transmission*

This term again describes a component altogether independent of the patented material. The term is not even discussed in the specification. The term appears in claims 1, 5, 7, 11 and 12. The Plaintiff construes the shift lever as:

> A moveable lever or arm associated with the replacement transmission for shifting gears within the transmission.

The Government expounds upon the definition with reference to the embodiment in the specification:

> A lever or arm attached to the gear selector shaft, which shaft penetrates the transmission housing. The shift lever is external to the transmission housing, and is a component of the transmission rather than the change-over linkage. The shift lever is identified in the specification as number 128.

The claim language makes it perfectly clear that the shift lever is not part of the change-over linkage, but rather part of the replacement transmission. We will not add unhelpful verbiage, such as the "associated with" language in Plaintiff's construction. Yet we also decline to be as specific as the Government or restrict the item to that depicted in the preferred embodiment.

During the hearing, we suggested a construction that specifies that the shift lever is not part of the changeover linkage, and that it translates motion from the linkage to the transmission. In response to the Defendant's concerns we proposed to specify that it ends at the shift lever. Plaintiff and the Government expressly agreed to the proposed language, and counsel for the two third-party defendants did not object. Accordingly, we construe the term "shift lever of the replacement transmission" to mean:

> A movable lever or arm, which is part of the transmission and not part of the change-over linkage, which transfers motion from the change-over linkage to the transmission. The changeover linkage ends at the shift lever.

*D.* *Rotationally Supported Elongated Member*

This next item is described by parallel references in claim 1 ("said elongated member having first and second ends that are rotatively supported"), and in claims 5 and 7 ("an elongated member supported for rotational movement at its right and left ends"). Each party concedes that the member need not be supported at the tip or extreme end but merely near its end portions.

However, the Government precipitated a separate disagreement with its proposed construction:

> Each of these phrases requires that the support be located at the end (i.e. the terminus or extreme part lengthwise) of the elongate member. The means for transferring motion to and from the elongate member must therefore be near, but cannot be located exactly on, the extreme ends of the elongate member. More importantly, the claim requires that the supports be located closer to the ends of the elongate member than are the means for transferring motion.

The Government's construction goes far afield – interpreting the location of the rotational supports along the elongated member, it imports into the claim the positioning of each mechanism and assembly appearing in the admittedly illustrative and non-binding diagrams. *See* 609 Patent, col. 5, ln. 28-31 (permitting modifications to illustrated embodiments). There is simply no support in the claim language for requiring that the means of transferring motion be located relatively closer to the center of the elongate member than are the rotational supports.

We construe the elongated member and the reference to the supporting structures and ends, in claims 1, 5 and 7, in the following manner:

> The elongate member is rotationally supported at or near each end, irrespective of the location of the means for transferring motion to and from the elongate member.

*E.* *Means-Plus-Function Claims*

There are three instances in which the parties construe means-plus-function language in the claims. A means-plus-function limitation in a patent claim is governed by statute:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, para. 6. This approach was designed as a convenience to "permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus." *O.I. Corp. v. Tekmar Co., Inc.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). Construction of a means-plus-function claim involves a two-step process. First, the Court determines the claimed function; and second, it identifies the corresponding structure in the written description that performs that function. *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) (citations omitted).

*(i.)* *"First-end" Means:*

We address the first two clauses together since they describe the same mechanism. The language at issue is:

> "Means proximate the first end of said elongate member connecting the gear selection mechanism of the vehicle to said elongate member for imparting rotational movement to the member in response to the driver's selection of gear" of claim 1; and
>
> "Means proximate the right end of said elongate member for connecting the gear selection mechanism of the vehicle to the elongate member for imparting rotational movement to the elongate member in response to the driver's selection of gear" of claims 5 and 7.

The "first end," or "right end," is clearly depicted in Figure 3. *See* Appendix. The parties agree that the language establishes a means-plus-function limitation under 35 U.S.C. § 112, para. 6. Furthermore, they agree that the claimed function is connecting the elongate member (represented by item 110, in Fig. 3) and the vehicle's gear selection mechanism for imparting rotational movement in response to the selection of gear. However, the Defendants and the Plaintiff have contrasting views on what constitutes the corresponding structure. Plaintiff contends it is limited to the single link (120) identified in specification, and the Government argues that the structure is the link (120) and the opening (124) on the link, which connects to the shift rod (18). *See* Fig. 2A-1 and Fig. 3.

A corresponding structure "must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function." *JVW Enterprises*, 424 F.3d at 1332 (quoting *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002)). The rules of construction are slightly different than those applied in the construing the remainder of the claim terms. The construction of the "means" term in each of the passages quoted above depends largely on what Jennings disclosed in the specification. Therefore, the normal prohibition against importing limitations from the specification does not apply to this short-hand method of claiming. As the Government notes, "[t]he price that must be paid for use of [means-plus-function language] is limitation of the claim to the means specified in the written description and equivalents thereof." *O.I. Corp.*, 115 F.3d at 1583; *see B. Braun Medical*, 124 F.3d at 1424 (describing *quid pro quo* for convenience of using § 112, ¶6).

The disagreement between the parties as it regards the determination of the means was aptly summarized by the Plaintiff's counsel: "Where do we draw the line?" Hearing at 11:44:03. Or in other words, how do we determine which items are responsible for the claimed function, and which items merely enable it. The case of *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303 (Fed. Cir. 1998) demonstrates, at least, *how* we draw the line. In that case, the Court of Appeals held that the district court erroneously identified a corresponding structure in relation to broad functional language in the specification, as opposed to the specific structure identified. *Id*. at 1308 (Corresponding structure was limited to the "skid plate" in the embodiment, not "support surface or plate" described in the specification); *see also, Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("corresponding structure" under 35 U.S.C. § 112, para. 6, is structure which "the specification or prosecution history clearly links or associates [with] the function recited in the claim.").

Applying these lessons, we look to Figure 3 and the specification's language, both of which demonstrate that the corresponding structure is the link with its opening. The claim describes a connection between the Gear Selection Mechanism and the

elongate member. Link (120) with its opening (124) is necessary for any connection, and a connection is necessary to impart rotational movement. The illustration discloses no other mode of connecting these components. Therefore, contrary to Plaintiff's assertion the opening on the link does more than merely enable the claimed function – it performs it. Our construction is not only supported by Figure 3, it also comports with the language of the specification:

> Link 120 *includes an opening 124 that connects directly* to shift rod 18 so that the driver's changing of gears through the gear selector lever in the driver's compartment may be mechanically transmitted to rod 110 as rotational movement of the rod.

609 Patent, col. 3, ln. 51-55.

Accordingly, we agree with the Government's construction for the "first end" means-plus-function language. Consulting Figure 3, we conclude:

> The structure disclosed in the specification for the claimed function is a structure capable of connecting to both the shift rod and the elongate member, and therefore capable of performing the function of imparting rotational movement to the elongate member. Therefore, the structure disclosed is item 120 together with feature 124, which feature allows item 120 to connect to the shift rod 18. Furthermore, item 120 must also be either bound to the elongate rod (110) or capable of being so bound.

*(ii.) "Second-end" Means:*

The remaining mean-plus-function clause is also found in claim 1, and pertains to the opposite end of the elongate member we have just discussed:

> *"Means proximate the second end of said elongate member for connecting the elongate member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongate member to movement operating the shift lever of the replacement transmission" appearing in claim 1.*

As in the previous case, the parties agree on the claimed function: connecting the elongated member to the shift lever of the replacement transmission and thereby converting rotational movement of the elongated member to movement operating the shift lever of the replacement transmission. However, Plaintiff again seeks to limit the structure corresponding to this function to a single link, in this case, link 130 as it appears on Figure 3.

We adopt the very same rationale discussed with respect to the "first end" means claim. The corresponding structure is that described within the specifications:

> A *multicomponent assembly* is mounted proximate the opposite end of rod 110 for connecting rod 110 to shift lever 128 of the replacement transmission 40 in such a way that rotational movement of rod 110 serves to operate the shift lever.

'609 Patent, col.3, ln. 56-60 (emphasis added). Similarly, the prosecution history refers to not one, but three linking structures – 130, 134 and 138. Finally, elsewhere in the claims the term "multicomponent assembly" is used to describe the connection between the left (second) end of the elongate member and the shift lever of the replacement transmission. *See* '609 Patent (Claim 5) at col. 6, ln. 30-34.

As in the case of link 120, link 130 alone is not capable of performing the function of connecting or converting rotational movement. It is one of several links that attach in order to permit the rotational movement to be transmitted from the elongated member to the shift lever of the transmission.

In arriving at the following construction, we incorporate only those structures from the specification that are necessary to perform the claimed function. *Micro Chemical Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). We conclude:

> The structure disclosed in the specification for the claimed function is a multi-part assembly capable of connecting the elongate member to the shift lever of the replacement transmission, and therefore capable of performing the function of transferring motion from the elongate member to the shift lever. The corresponding structure includes: links 130, 134 and 138, and bolts 145 and 147, an opening 140 in link 138 which connects directly to the shift lever 128, and slot 149 in link 134.

*F.* <u>*Connecting*</u>

At the *Markman* hearing, the Plaintiff addressed "connecting" in the context of the means-plus-function language, although, as the parties recognize, the term occurs in other contexts throughout the claims. *See* Claims 1, 5, 7, 11 and 12.

The parties dispute whether the term "connecting" connotes a direct, physical connection or includes an indirect connection. The Government asserts that "connecting," as it is used in the 609 Patent claims, means a direct connection. Jennings proposes a broader usage of the term:

> "Connecting" in the context of the claims means that certain elements of the claim are linked. "Connecting", as used in the '609 patent, means that the elements are joined or linked directly or indirectly.

*See also*, Pl. Br. at 33 ("'Connecting' is a broad word frequently used in patent parlance by patent practitioners to describe a coupled, joined, or linked relationship between two components. Usually it is not meant to suggest or mean that a hard and fixed physical connection exists between components.")

This issue raises once again the controversy of how the description in the specification informs the construction of the claim language. A claim term is given its ordinary and customary meaning, defined as "the meaning that the term would have to a person of ordinary skill in the art." *Phillips*, 415 F.3d at 1313. According to the Government, Jennings' construction violates the principles of *Phillips*, in that it is "divorced from the context of the written description and prosecution history." *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005). We are well aware that the claims of a patent cannot be broader in scope than the invention set forth in the specification. We recognize that in certain circumstances, the common usage of a claim term is necessarily limited by the specification. *Id.* at 1145.; *see also*, *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1321).

Contrary to the Defendant's characterizations, however, the Plaintiff's construction of the claim is not entirely divorced from the specification. Jennings, in fact, relies on the specifications for support. As the Plaintiff argues, the phrase "connects directly," as opposed to "connecting," is used elsewhere in the specifications. Consequently, when "connecting" is not so limited, it should be given its ordinary broad meaning. *See* Pl. Br. at 35 ("Consistency requires that if 'connecting' required a direct connection, then the claims would have stated that just as stated in the written specification.") We agree.

While it is true as a practical matter that the change-over linkage is ultimately linked to the "gear selection mechanism" and the "shift lever of the replacement transmission," the language of the claims does not mandate a direct connection in each and every case. Indeed, in the language of the claims, the change-over linkage "*operatively* connect[s]" these components. 609 Patent, col. 6, ln. 15-18. We would restrict the claims by requiring a direct connection only in those cases where because a means-plus-function clause was used, Jennings is limited to the direct connection referenced in the specification language. *O.I. Corp.*, 115 F.3d at 1583*; see e.g.*, 609 Patent, col. 3, ln. 51-55 ("Link 120 includes an opening 124 that *connects directly* to shift rod 18 so that the driver's changing of gears through the gear selector lever ... may be mechanically transmitted to rod 110 as rotational movement of the rod.") and col. 3, ln. 62–63 ("Opening 140 in link 138 *connects directly* to shift lever 128.") (emphasis added). We hold that:

> "Connecting" <u>does</u> <u>not</u> mean "directly connecting." In the context of the patent, "connecting" merely implies a relationship or link between two parts. Where the patent wishes to specify physical contact, it uses the phrase "directly connecting."

*G.* *<u>At least one additional length pivotally connected to the first component</u>*

Claims 5 and 7 describe various aspects of the change-over linkage. In describing just one aspect of the change-over linkage – the left end multicomponent assembly we just addressed – the claims indicate that the assembly is comprised of:

> a first component projecting from said elongate member and *at least one additional link pivotally connected to the first component*, said at least one additional link attaching to the shift lever to convert rotational movement of the elongate member to movement operating the shift lever.

609 Patent, col. 6, ln. 33-39 and col 7, ln. 6–10 (emphasis added). The Plaintiff, the Government, and presumably Ready Built, agree that the language "additional link pivotally connected to the first component" makes no claim respecting the movement of the additional link (labeled 134 on Fig. 3) in relation to the elongate member (labeled 110 on Fig. 3). The claim merely specifies that the additional link must be connected to, and be capable of pivoting relative to the first component, item 130.

Third-Party Defendant Jasper Engines proposes an alternate construction. Although Jasper also would require the additional link to revolve around the first component, Jasper adds language describing the pivotal movement relative to the elongate member:

> This limitation requires that the "at least one additional link pivotally connected to the first component" be capable of pivoting about the elongate member together with the "first component projecting from said elongate member."

The clarification verbalizes practical concerns, which counsel attempted to demonstrate during the hearing with the aid of a common pen cap. Basically, Jasper's construction ensures that the "additional link" must be able to rotate freely, without making contact with the elongate member. Jasper cites to the drawings (Fig. 3) which shows the first component (130) connected to the additional link (134) by a bolt (145) which can be loosened and the tightened to adjust the relative position of the two links along an adjustment slot (149). Since the overall length of the multicomponent assembly is adjustable, Jasper argues, the additional link pivotally connected to the first component must be capable of pivoting about the elongate member together with the first component which projects from the elongate member. *See* Jasper's Br. at 4.

While we appreciate the practical issues raised by Jasper, there is no support for adding this limitation to the claims. We, therefore, adopt the construction which the Government and Jennings agree upon:

> The language of claims 5 and 7 requires that the "at least one additional link" be connected to and pivot relative to the "first component."

*H.* *Kit*

Claim 7 of the 609 patent sets forth the items of a kit containing the parts needed for replacing the original transmission with a transmission adapted for use with a left-side shift lever. The language of claim 7 begins:

> A kit for use in replacing the transmission of a right hand drive vehicle that has a right side gear selection mechanism and a right side shift lever on the transmission with a replacement transmission having a left side shift lever, said kit comprising:

609 Patent, col. 6, ln 47-51. This language, described by Plaintiff in this litigation as a preamble, is immediately followed by a list of items, many of which are more fully described in the previous claims: a replacement transmission with left-side shift lever; a drive shaft of sufficient length to accommodate the replacement transmission; the change-over linkage with right-side and left-side support members; the elongated member supported for rotational movement at its right and left ends; the means proximate the right end of the elongate member; and the multicomponent assembly proximate the left end of the elongate member. *See* 609 Patent, col. 6, ln. 52-67 - col. 7, ln. 10. The items are described in the Court's short-hand here; these descriptions in no way alter our previous rulings on construction.

Dependent claims 8-10 also use the term "kit." According to claim 8, "[t]he kit of claim 7" also includes "a dust cover, a catalytic converter bracket and a transmission fluid dipstick." 609 Patent, col. 7, ln. 11-12. Likewise, claim 9 provides that the kit includes "a cable and associated connector for hooking to the accelerator and the throttle of the fuel injector intake of the vehicle to control the shift points for transmission." 609 Patent, col. 7, ln. 13-16. Finally, claim 10 elaborates on the change-over linkage's multi-component assembly, setting forth the three components that make it up, including the "pivotally connected" additional link, we addressed earlier.

The Plaintiff offers two arguments in relation to the use of the word "kit" in the 609 Patent. First, Jennings contends that the term need not be construed because it appears in preamble language, as opposed to in the body of the claims. Second, it argues that if the Court defines the term it should define "kit" as a set of parts to be assembled; individual parts of the kit may comprise an assembly.

The Government argues that the term should be construed as follows:

> A packaged set of parts. The ordinary meaning of the term "kit" does not encompass a completed assembly of the parts included in the "kit." The claim requires that the listed components of the kit be supplied together and not purchased separately.

Joint Claim Construction Statement at 23.

As an initial matter, Plaintiff's argument that we should refrain from interpreting the use of the word "kit" in the claims is not compelling. According to the Plaintiff, "kit" is strictly a preamble term. Jennings reasons, therefore, "kit" is in no manner limiting on the body of claim 7.

Whether in the preamble or in the body, we cannot simply disregard the use of a term that appears in an independent claim, as well as three dependent claims. Nor can we assume, as Plaintiff suggests, that it is merely a "convenient label." *See On Demand*, 442 F.3d at 1343 ("In considering whether a preamble limits a claim, the preamble is analyzed to ascertain whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim.")

"Kit" was used here as a term of art to identify patentable subject matter. *See generally, In re Venezia*, 530 F.2d 956, 189 U.S.P.Q. 149 (C.C.P.A. 1976) (35 U.S.C. § 101, pertaining to patentable subject matter, construed to include a group or "kit" of interrelated parts.) The use of the word in claims 7-10, distinguishes these claims from other aspects of the invention, such as the assemblies themselves (claims 1-6) or the method of installing them (claims 11-12). *See* 609 Patent, col. 1, ln. 46-67 - col. 2, ln. 1-12 ("summary of invention" describes several "aspects" of the invention.)

With that said, Plaintiff's construction makes more sense than does the construction offered by the Government. "Kit" as it is used in the claims, is indeed a set of parts to be assembled. The Government's proffered construction imposes a "packaged" limitation, as well as a limitation seemingly prohibiting the pre-assembly of any of the components within the kit. We found no support in the claims or the specifications for limiting the term in this manner.

As for the assembly restriction, obviously the items of the "kit" cannot be completely assembled; Plaintiff would not argue otherwise. But it is just as apparent that some pre-assembly is anticipated. The specification includes a lay-out of the primary components of the "kit." *See* 609 Patent at Fig. 5. We know from our review of the previous claims that at least one of the items depicted – the changeover linkage – contains quite a few sub-components. *Compare* 609 Patent Fig. 3 *and* Fig. 5, item 70.

Defendant's "packaged" limitation is likewise too restrictive. The phrase "packaged set of parts" apparently has as its source language used in a separate opinion in the case of *Norian Corp. v. Strykker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004), wherein Judge Schall states "a kit is generally understood to be a packaged set or collection of related items." *Id.* at 1335 (Schall, J., concurring-in-part and dissenting-in-part). There is no reason to accord any special deference to this generic definition given in an entirely independent context. A close examination of the dissent reveals that the Circuit Judge was attempting to define the "consisting of" limitation of a kit claim; he did not set out a standard to be universally applied in construing the term "kit." *Id.* at 1334-36.

A packaged requirement can be found nowhere in the claims or specifications. Although claim 5 clearly signals "said kit comprising of [the various elements of the invention]" one cannot read into the claim a requirement that each of these components is supplied together or arrive in a single package. Accordingly, we adopt the following construction for the term "kit":

> A kit is a group of multiple, but related parts, which are designed to be assembled by the recipient into a working assembly.

*I.* *Sequence Limitation for Method*

The final issue raised by the parties is whether a sequence limitation can properly be read into the method set forth in claim 11. The Government argues that the claim establishes a step-by-step procedure which mandates a specific order of accomplishing the method. Claim 11 provides:

> A method for replacing the transmission of a right hand drive vehicle that has a right side gear selection mechanism and a right side shift lever on the transmission with a replacement transmission having a left side shift lever, said method comprising the steps of:
>
> removing the original transmission and original drive shaft from a right hand drive vehicle having a right side gear selection mechanism;
>
> raising a replacement transmission with left side shift lever, and associated torque convertor, into position;
>
> connecting the torque convertor to the flywheel of the vehicle;
>
> securing the replacement transmission in place on the vehicle chassis;
>
> installing a right-to-left changeover linkage operatively connecting the right side gear selection mechanism of the vehicle to the left side shift lever on the replacement transmission; and

installing a drive shaft having the correct length to accommodate the dimensions of the replacement transmission.

609 Patent, col. 7, ln. 24-28 - col. 8, ln. 1-18. Claim 12 is a dependent claim which focuses on the changeover linkage:

> The method of claim 11 wherein the step of installing the changeover linkage comprises rotatively mounting an elongate member having right and left ends so that the member transversely spans the replacement transmission, connecting the right end ... to the gear selection mechanism ... and connecting the left end ... to the shift lever of the replacement transmission.

609 Patent, col. 8, ln. 19-26.

Under the Government's construction, claims 11 and 12 only protect a method with those steps sequentially detailed in claim 11. According to the Defendant:

> Claims 11 and 12 require that the steps of "raising a replacement transmission with left side shift lever, and associated torque converter, into position" and "installing a right-to-left change-over linkage operatively connecting the right side gear selection mechanism of the vehicle to the left side shift lever on the replacement transmission" be performed in the specific sequence listed in claim 11. The replacement transmission must be raised into position in the vehicle prior to the installation of the "right-to-left change-over linkage."

This limitation presumably would narrow the field of potentially infringing methods. Defendant argues, however, that its construction is warranted by the language "said method comprising the steps of ...". 609 Patent, col. 7, ln. 28.

The Court of Appeals has repeatedly held that unless the steps in a method require an order – either expressly or by implication -- the claim should not be construed to require one. *See Altiris*, 318 F.3d at 1369 (quoting *Interactive Gift Exp., Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001)). As Jennings indicates, the claimed method does not use qualifiers such as "first," "then," "before," or "after." *See Oak Technology, Inc. v. Internatl. Trade Com'n*, 248 F.3d 1316, 1325 (Fed. Cir. 2001) (Court held that plain language of claim "contemplates and explicitly describes a sequential process.")

Certainly there is a logically implied sequence for some steps – the original transmission must be removed before the replacement transmission can be mounted. *See Mantech Envtl. Corp. v. Hudson Envtl. Service, Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1988) (sequential method was "apparent from the plain meaning of the claim language.") Yet other steps do not have a logically implied sequence. For example,

raising the replacement transmission into place could logically occur before or after the installation of the change-over linkage.

We conclude that the method of claim 11 is not restricted to a particular sequence. The steps of claim 11 do not expressly or implicitly require an order. The procedure described in the specification is markedly more detailed than the claimed method. *See* 609 Patent at col. 4, ln 28 - col. 5, ln. 27 ("step-by-step procedure" including 28 steps). However, nothing in the language chosen in claiming the method communicates the sense that there is only one correct way to complete the steps. *See e.g., Altiris*, 318 F.3d at 1371 (declined to import sequence from specification, where there was no "statement that [the] order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps.")

**III. <u>Conclusion</u>:**

Although the Court reserves the right to alter its rulings and modify the constructions it has reached, the parties shall proceed based on these rulings.

We encourage the parties to take advantage of the ADR opportunities offered by the Court, in the new light of these findings. **The parties shall file a Joint Status Report no later than January 31, 2008**, indicating whether a stay pending ADR is desirable and, if not, providing an updated schedule for discovery and further proceedings.

**IT IS SO ORDERED.**

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge

APPENDIX








FIG. 1
PRIOR ART

DA2

FIG. 1A

PRIOR ART




DA3




FIG. 2A-1

FIG. 2

DA4

FIG. 2A


92
94
12
40
74
110
70
116
76
130
104
112
100
120
134
138
128
150
176
154B

DA5

FIG. 3




8 of 15

**609**

76

DA6

150 176



74
104
70
120
124
100
80
82
110
145
130
134
140
149
147
138
112
84
86
88
76
116


FIG. 4

DA7

Case 1:05-cv-01209-LMB Document 42 Filed 03/23/2007 Page 11 of 15



FIG. 5




DA8